Mabel L. **LOWRY**, Plaintiff,

v.

**WHITAKER CABLE CORPORATION,**
Defendant.

**Civ. A. No. 18015–3.**

United States District Court,
W. D. Missouri, W. D.

April 24, 1972.

James W. Jeans, William H. Pickett, Kansas City, Mo., for plaintiff.

Jack L. Whitacre, Spencer, Fane, Britt & Browne, Kansas City, Mo., Russell Specter, Deputy Gen. Counsel, EEOC, Washington, D. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, JUDGMENT

WILLIAM H. BECKER, Chief Judge.

This is an action under the Equal Employment Opportunity Act, Section 2000e–5 of Title 42, United States Code, in which the plaintiff alleges that she was subjected to discriminatory working conditions by defendant and was dismissed from her employment by defendant solely because of her race. Plaintiff also alleges that she has completed all the procedures requisite to the jurisdiction of this Court in the Missouri Commission for Human Rights and in the Equal Employment Opportunity Commission. Concerning compliance with the administrative procedures outlined in Section 2000e–5, supra, plaintiff alleged in her original complaint that the last act of discrimination against her occurred on August 28, 1967, when she was dismissed from employment, allegedly because of her race; that she "filed a charge of such violations with the Equal Opportunity Commission on January 2, 1968"; that "the Commission filed its final investigation report on February 13, 1969"; that "a decision of said Commission was rendered on October 15, 1969" (copy of which is attached to the original complaint herein and incorporated herein by reference); that "an effort to conciliate with Defendant was unsuccessful"; that "a notice of right to sue within thirty days was sent to the Plaintiff by said Commission on December 23, 1969"; and that "this civil action is now being brought against the Defendant, all of said procedures being in compliance with Title 42 USCA Section 2000e–5."

### The Jurisdictional Questions

In the "decision" of the national Commission which is attached to the original complaint, the following remarks are made with respect to jurisdiction. "The Commission received the charge on September 7, 1967, and deferred it to the appropriate State agency on September 11, 1967. The Commission filed the charge and assumed jurisdiction on November 10, 1967, within the time limitations prescribed by Title VII." Similar statements of jurisdiction were made in the Stipulation of Uncontroverted Facts and Standard Pretrial Order No. 2, with no material differences. It therefore did not conclusively appear that plaintiff had filed a charge with the national Commission "within two hundred and ten days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, *whichever is earlier,*" as required by Section 2000e–5(d), Title 42, U.S.C.[1] There-

1. It appears that, at the time of the decision of this case, the requirement of filing within 210 days of the act complained of or 30 days after notice of the termination of state proceedings, whichever is earlier, remains jurisdictional. In Washington v. Aerojet-General Corporation (C.D.Cal.) 282 F.Supp. 517, the plaintiff requested that the national Commission assume jurisdiction of his case before the state agency had completed its proceedings and did not thereafter renew any request for the national Commission to take action on his case. The Court held that "[a] timely charge filed with the EEOC is a prerequisite to suit under Title VII of the Civil Rights Act of 1964" 282 F. Supp. 524) and that "plaintiff filed no timely charge with the EEOC and he may not maintain this present suit." A similar fact situation was involved in International Brotherhood of Electrical Workers, Local Union No. 5 v. United States EEOC (W.D.Pa.) 283 F.Supp. 769, the record in which showed that the complained-of act occurred on July 21, 1965, the state proceedings commenced on September 10, 1965, and the aggrieved employee submitted a request that the national Commission take jurisdiction on December 27, 1965. In that case, the trial court erroneously held that there was no jurisdiction of the federal court because no formal charge had been *served* upon the Union complained against until more than 30 days after the termination of the state proceedings and more than 210 days after the act complained of. Such a ruling is contrary to the holdings of this Court in Vogel v. Trans World Airlines (W.D.Mo.) 346 F.Supp. 805, that it does not matter when the charge is served, so long as it is timely filed with the national Commission. See also Everett v. Trans World Airlines (W. D.Mo.) 298 F.Supp. 1099, 1102. Accordingly, the *International Brotherhood* case was reversed by the Third Circuit Court of Appeals in an opinion reported at 398 F.2d 248. The appellate court noted that there was "no time limitation imposed by the Equal Employment Opportunities Act or the regulations of the EEOC by which a charge must be served and proceeded with by the Commission." 398 F.2d at 252. Consequently, the Court found that the employee's letter of December 27, 1965, constituted the filing of a valid charge with the national Commission. The Court was careful, however, to note that a timely charge must be filed with the national Commission and that a charge filed prior to the sixty-day deferral period to the state agency is not "a valid charge when received by the Commission . . . for it had not been sent to the Pennsylvania Human Relations Commission and the required sixty days had not passed." 398 F.2d at 252. The Supreme Court *subsequently denied* certiorari, which is reported at 393 U.S. 1021, 89 S.Ct. 628, 21 L.Ed.2d 565. The rule of Bowe v. Colgate-Palmolive Company (S.D.Ind.) 272 F.Supp. 332, reversed on other grounds and affirmed in part (C.A.7) 416 F.2d 711, that a timely charge must be filed before the federal court can have jurisdiction, is still viable. See Edwards v. North American Rockwell Corp. (C.D.Cal.) 291 F.Supp. 199; Sciaraffa v. Oxford Paper Company (D. Me.) 310 F.Supp. 891, 896, and cases therein cited. Some recent cases, e. g., Dent v. St. Louis-San Francisco Railway Company (C.A.5) 406 F.2d 399, are insistent that the "only two requirements for an aggrieved party before he can initiate his action in the United States district court [are that] (1) he must file a charge with the Equal Employment Opportunity Commission and (2) he must receive the statutory notice from the Commission that it has been unable to obtain voluntary compliance." 406 F.2d

fore, under the obligation of the Court to examine on its own motion the question of jurisdiction (Treinies v. Sunshine Mining Co., 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85, reh. den. 309 U.S. 693, 60 S.Ct. 464, 84 L.Ed. 1034), a show cause order was entered on September 4, 1970, directing plaintiff to show cause within 10 days why this action should not be dismissed "by stating if and when she received written or actual notice of the termination of the proceedings of the state agency and by stating, if she has received no such notice, whether her case is still pending before the state agency, or whether the state agency ever initiated any processing of it." Plaintiff's original response, filed on September 14, 1970, stated in part:

> "In the handling of this charge, it was initially received by the Equal Employment Opportunity Commission in September of 1967, and was deferred to the Missouri Commission on Human Rights on September 11th, 1967 . . . The first notification received by Mabel L. Lowry that the *deferral period to the State had expired* was by letter from the Equal Employment Opportunity Commission dated December 18th, 1967." (Emphasis added.)

Plaintiff, however, did not state any notice which she might have received of the termination of the state proceedings, which, under most circumstances, would be a different date than the date marking the expiration of the deferral period. Nor did she specifically disclaim having received such a notice. Therefore, under the response made, it was conceivable that the State proceedings might have terminated more than 30 days prior to January 2, 1968, and plaintiff might have received notice of such termination more than 30 days prior to January 2, 1968. Plaintiff was therefore directed to file a supplemental response making allegations which were responsive to the original show cause order. In response, plaintiff stated that she was notified of the termination of State proceedings by a letter from the Missouri Commission on Human Rights dated December 31, 1968. The additional allegations of the successive responses were then incorporated into an amended complaint filed by plaintiff as directed by the Court on October 19, 1970. In the answer to the amended complaint, defendant admitted the above facts essential to the jurisdiction of this Court. Even, therefore, assuming that the filing of a charge by the national Commission with itself on November 10, 1967, was premature because it was prior to the termination of the sixty-day period which the national Commission is required to afford the State agency "to remedy the practice alleged" by Section 2000e–5(c) (see International Brotherhood of Electrical Workers, Local Union No. 5 v. United States EEOC (C.A.3) 398 F.2d 248, 252),[2] the charge which

at 403. But it has not yet been held, in a case involving a relevant state law, that the requirement of a timely filing of a charge with the national Commission is not mandatory. Recent holdings in Vigil v. American Telephone & Telegraph Company (D.Colo.) 305 F.Supp. 44, and Love v. Pullman Co. (C.A.10) 430 F.2d 49, have deemed it so. See also Anno. 4 ALR Fed 833, 845–846. At page 848, in the last source, it is stated that "[a] few cases in which no relevant state law was involved" have held the time requirement to be directory.

2. Is such a filing premature? Can it constitute compliance with the act? See, International Brotherhood of Electrical Workers, Local Union No. 5 v. United

States EEOC, *supra.* The recent case of Vigil v. American Telephone & Telegraph Co., *supra,* has taken exception to this interpretation, stating that, in many cases, if the plaintiff waits for 60 days to give the state agency an opportunity to act on his complaint, he would have to miss the 210-day limitation deadline. But the necessity of that rule would now seem largely to have been obviated by the recent holding in Culpepper v. Reynolds Metals Company (C.A.5) 421 F.2d 888, that, during an employee's pursuit of his contractual remedies under an employment contract (which the Court analogized to the "local . . . settlements . . . if there is a state or local fair employment practice committee," 421 F.2d at 893), the final limitation period was toll-

was filed with the national Commission on January 2, 1968, was within 210 days of the alleged discriminatory practice. Further, the 210-day period ended earlier than the period which terminated 30 days after notice was received of the termination of State proceedings, on December 31, 1968. Thus, the jurisdictional requirements of Love v. Pullman Co. (C.A.10) 430 F.2d 49, reversed in 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679; Washington v. Aerojet-General Corporation (C.D.Cal.) 282 F.Supp. 517; and International Brotherhood of Electrical Workers, Local Union No. 5 v. United States EEOC, *supra*, have been met by plaintiff in the case at bar.

Because of the uncertainty in the field of jurisdiction resulting from the decision of the Tenth Circuit Court of Appeals in Love v. Pullman Co., 430 F.2d 49, and the grant of certiorari to review that decision in 401 U.S. 907, 91 S.Ct. 873, 27 L.Ed.2d 805, a draft of this opinion was prepared but filing thereof stayed pending the decision of the Supreme Court of the United States in the *Love* case. After the decision of the Supreme Court of the United States reversing the *Love* case, the draft opinion was distributed to counsel for oral and written comments and objections to the proposed findings of fact, conclusions of law and judgment for plaintiff. At the oral argument it was agreed that the final decision in the *Love* case did not affect the jurisdiction in this case.

█ In its answer to the amended complaint, defendant further denies that "this Court has subject matter jurisdiction over this action to the extent it seeks redress for alleged unlawful employment practices of discrimination which practices were not charged before the Equal Employment Opportunity Commission and to the extent it seeks redress of charges the Equal Employment Opportunity Commission did not

find reasonable cause to believe had merit." The "decision" of the national Commission dated October 15, 1969, recites that:

> "Charging Party alleges that Respondent Employer engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 by maintaining policies in regard to layoffs, locker assignments, and overtime which affected her disparately because of her race (Negro)."

Basically, four contentions have been raised by plaintiff in the case at bar and have been considered by the Court. They are (1) the issue of plaintiff's having been criticized by defendant's supervisors immediately after her first week of work for slow production; (2) the alleged discrimination in locker assignments; (3) plaintiff's not being invited on one occasion to eat in the lunch room with other employees; and (4) the alleged discriminatory discharge. All of these contentions except (1) and (3) above were expressly raised before the Commission, according to its decision of October 15, 1969. Contention (1) was considered by the Commission as an evidentiary contention in support of contention (4) above. Further, this Court has considered the lunch room contention, not as an independent request for relief, but as an evidentiary contention submitted as support for the same pattern of discrimination which is made out by the other contentions. (As stated hereinafter the defendant's view of this incident has been adopted, and the contention found to be lacking in merit.) Thus, there is no factual merit to defendant's claim that the substance of the complaint herein has not been brought before the national Commission. It is true that the Commission found reasonable cause to exist to believe only that "respondent is in violation of Title VII of the Civil Rights Act of 1964 by main-

cd. Further, the doctrine of Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679, permitting the EEOC to hold a complaint in a state of "suspended

animation" tends to remove technical time barriers to Civil Rights complaints of this type.

taining a layoff policy which discriminates against Negroes because of their race." Thus, reasonable cause was not expressly found with respect to the other two contentions, although such a finding is implicit with respect to the premature criticism of plaintiff for low production. Further, in Shannon v. Western Electric Company (W.D.Mo.) 315 F.Supp. 1374, this Court held that a finding of reasonable cause by the Commission was not a prerequisite to bringing suit in federal district court if the other conditions precedent to federal judicial jurisdiction had been met. And, even if an opposite rule were applicable, the only relief granted in this cause is in respect to the discriminatory discharge of plaintiff, a ground clearly considerable. The other contentions were considered only as evidentiary contentions indicating a background of discrimination in which the discriminatory discharge occurred.

 This cause was tried to the Court sitting without a jury.[3]

### Findings of Fact and Conclusions of Law on the Merits

Plaintiff was employed by defendant on August 9, 1967, as a "miscellaneous hand and bench worker" under foreman Don Stockham. A "miscellaneous hand and bench worker" performs miscellaneous manual work in the Battery Department. Plaintiff was required to do several different types of work, including work which required some degree of manual dexterity. Plaintiff, for instance, was required, among other things, to tape the ends of battery cables, to trim the cables, slip rubber sleeves over lugs, cut rubber sleeves, place sleeves on the cables, place metal conduits on cables, place vinyl sleeves over lugs and to paint parts of the cables for color coding. Spot taping was also required to be done in accordance with customers' specifications.

The conditions of employment with defendant were established by the collective bargaining contract between defendant and the International Association of Machinists District 71, representing a bargaining unit composed of production and maintenance workers for defendant in North Kansas City, Missouri. The contract which was in effect from May 8, 1966, to May 7, 1969, provided that:

"New employees will be on probationary status for thirty-one (31) consecutive calendar days, during which period, they may be terminated for any just cause by the Company, such action shall not be deemed a breach of this Agreement or considered a grievance by the Union."

Under these contractual provisions, the defendant carefully reviews the work of an employee during the probationary period to determine whether the employee should be retained as a regular employee. If retained, the employee thereafter has the rights and protection of the union contract. If the employee is properly terminated before the end of the probationary period no such rights and protection are secured by the employer. During the probationary period, new employees are observed for their qualifications, their dexterity, their ability and their work performance.

 The defendant contends that its evidence supports the finding that

---

3. Plaintiff's demand for a jury trial was stricken on August 17, 1970, in accordance with Section 2000e–5(g), Title 42, U.S.C., which designates the Court as the trier of fact, and Roberson v. Great American Insurance Companies of New York (N.D.Ga.) 48 F.R.D. 404, 423; Hayes v. Seaboard Coast Line Railroad Company (N.D.Ga.) 296 F.Supp. 1232, 1239, reversed on other grounds (C.A.5) 421 F.2d 888; Hayes v. Seaboard Coast Line Railroad Co. (S.D.Ga.) 46 F.R.D.

49. To warrant a trial by jury, the claim must be of such a nature as would entitle a party to a jury at the time of the adoption of the Seventh Amendment. NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Mitchell v. Robert De Mario Jewelry, Inc., 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323. See also Moss v. Lane Company (W.D.Va.) 50 F.R.D. 122, 128.

"[d]uring the first week, new employees are advised the Company does not 'pressure' anyone for quantity, as the Company is primarily interested in their work habits, attitude and attendance."[4] Yet the evidence shows clearly that on August 17, 1967, defendant's Industrial Relations Manager, Charles Davis, informed plaintiff that her production was slow, and that, if it did not improve plaintiff's employment would have to be terminated.[5] This warning is significant evidence of discrimination because: (a) it came after only six working days and after eight total days from the date of plaintiff's employment rather than after the "two weeks" recited therein; (b) the warning was contrary to admitted policy to refrain from exerting pressure for quantity during the first week.[6] Standing alone this incident does not prove racial discrimination but it is material evidence to be considered in the totality of the circumstances. According to the form denominated "employee's service record," which was introduced in the trial of this cause as plaintiff's Exhibit 7, the entry thereon made by Mr. Davis respecting the conference held with plaintiff on that date read as follows:

"Empl. consulted by foreman & I that her work performance was considerably below par for two weeks and improvement would need to be shown within the next two weeks. Foreman is to inform her periodically of her progress."

As noted above, however, plaintiff had not then been in the employ of defendant for two weeks, but rather for only six working days. Further, according to the testimony of Davis, the information respecting plaintiff's purported "below par" work performance came from the foreman over plaintiff, Donald E. Stockham. Davis testified that he himself could not remember seeing plaintiff at work or ever examining any record of her productivity. Further, Stockham, in his testimony in the trial of this cause, testified that, during the probationary period, plaintiff's attendance was good;[7] her work habits were not good; that the quality of her work was good even though the quantity was comparatively small; and that during the probationary period, defendant was primarily concerned with attendance, work habits and quality, rather than quantity, of production. The adverse testimony respecting plaintiff's work habits during the probationary period was that at times Stockham would see plaintiff leaning across the work table talking to someone else and plaintiff would try to sit and work, when standing was better. The evidence also shows that, because of the diversity of tasks which were assigned to plaintiff, a co-worker named Betty was assigned to be near plaintiff

---

4. This is contained in the defendant's proposed findings of fact and conclusions of law. This amounts to a formal judicial admission of the fact stated. McCormick, Evidence § 242, p. 508, 1954 ed.

5. On plaintiff's employee's service record, a record maintained by the defendant and offered in this case as evidence, it is noted that a conference was held on August 17, 1967, during which
 "Empl. consuled (sic) by foreman & I that her work performance was considerably below par for two weeks and improvement would need to be shown within the next two weeks. Foreman is to inform her periodicaly (sic) of her progress."
 Davis testified in the trial herein that he made the entry. Plaintiff testified that

she was reprimanded for slow production during this meeting. Stockham, the foreman, also testified that on August 17, 1967, Mr. Davis told plaintiff that her production was slow "mainly because [of] her work habits" and that if plaintiff did not improve, her employment would be terminated. Davis testified that he had no independent recollection of the reason for the low performance rating given on August 17, 1967, but he stated that his information came from Stockham.

6. See note 4, *supra*.

7. No records were apparently made to verify this, but defendant has relied upon the testimony of foreman Stockham.

and to counsel her with respect to the various operations which had to be performed. It was plaintiff's testimony that she was talking to Betty during these times, and the testimony was not contradicted.[8] As stated above Stockham also criticized plaintiff for doing some of her work while seated. He testified that it was his opinion that the type of work which plaintiff did could better be accomplished while standing, particularly since part of the work involved opening a "duck bill" with the legs and feet. On cross-examination, however, Stockham admitted that plaintiff, because of her comparatively large size, had better success than most workers in opening the duckbill while sitting. It therefore appears that, at the time that plaintiff was warned by Mr. Davis on August 17, 1967,[9] plaintiff was on probationary status and her work and conduct were not then below standards established by the defendant for the early probationary period. Therefore, the warning given her by Mr. Davis on August 17, 1967, concerning "considerably below par performance" was unwarranted.

What is more significant is that neither Stockham, nor Davis, claim that plaintiff's employment was terminated for unsatisfactory performance in the probationary period. Their claim, and that of the defendant, is that plaintiff voluntarily quit her employment, an inconsistent claim which will be discussed hereinafter.

It is also plaintiff's contention that she was the victim of racial discrimination in the failure of defendant to assign her a locker.[10] On this issue, the testimony shows that, six or seven days prior to plaintiff's discharge, plaintiff requested to be assigned a locker. This was the result of her having lost her gloves and apron on Saturday following her first work week. Having no locker at the time, plaintiff had left her gloves and apron in the work room. On Saturdays, some employees work overtime. When plaintiff returned to work on Monday, her gloves and apron had disappeared. Thereafter, plaintiff requested to be assigned a locker. Her request was addressed to Mr. Davis. Davis stated that he thought plaintiff had already been given a locker and thereupon granted plaintiff a locker assignment and gave plaintiff the keys to a locker. The keys, however, plaintiff discovered, would not work in the lock for the locker to which she was assigned. The maintenance man therefore took the keys back to Davis who said that he would look into the matter. It was determined that the keys would not work because of the paint which had been placed on the lock. Therefore, Davis stated that he would attempt to obtain a new lock for the locker. According to the testimony, the new lock was not received until some-

---

8. The fact that Betty was admitted assigned "nearby" plaintiff to help her acquaint herself with her new tasks would support plaintiff's testimony in this regard.

9. There is some apparent conflict in the evidence on the reason that the conference of August 17, 1967, was called. Stockham testified that he arranged for plaintiff to meet with Davis because plaintiff had complained of racial prejudice in respect to the locker and cafeteria complaints and because Stockham had criticized her work habits on two or three prior occasions. This would seem to comport with the charge filed by plaintiff in the EEOC wherein she states that she was laid off purportedly because her production was slow, but she believed it was because she complained regarding racial

prejudice. Plaintiff otherwise testified that she was called in and told she would be discharged because of slow production, if she did not improve. But the conference may have been for both reasons. Furthermore, it purports to be a review of plaintiff's production based upon the first week of her work when she was not to be "pressured" or rated according to the quantity of production.

10. In her charge filed with the EEOC, plaintiff stated that she was told when she was hired that she would be assigned a locker. Plaintiff also testified that the other employees she talked to said she was supposed to have a locker. This, however, is inadmissible conclusory hearsay.

time in September, after the termination of plaintiff from her job with defendant.

■ It is defendant's contention in its proposed findings of fact that "Lockers were generally assigned on a seniority basis" and that 36 lockers were available for the use of 55–60 persons in the department. The evidence of this, however, is not persuasive. When plaintiff made her request to Davis, Davis stated that he thought plaintiff already had been assigned a locker. This would have hardly been the case had lockers been assigned on the basis of seniority and if they were as scarce as defendant now contends they were. Apparently lockers were available, because Davis purported to assign a locker to plaintiff. The defendant's arguments fail to provide a satisfactory explanation of the proven cavalier treatment of plaintiff's request for a usable locker. Like the warning incident, this incident standing alone does not make a case of racial discrimination but it is a significant circumstance to be considered in the totality of the circumstances. Therefore, it is found that the failure to assign plaintiff a locker upon her request or to provide alternate security for her possessions was unwarranted and unjustified by the surrounding facts and circumstances.

■ Plaintiff also complains that on the day of an inspection to be conducted by certain supervisors, or "white shirts," other employees in her department were advised by the foreman to eat in the lunch room, but plaintiff was not so advised, with the result that she was the lone employee eating in the work shop when the "white shirts" came through to make their inspection. The testimony on this issue is uncontradicted that plaintiff was eating in the work room when the inspection team came in and that she was not directly advised by Foreman Stockham that employees were to eat in the lunch room on that date.

It was Stockham's testimony that he learned of the impending inspection on rather short notice and therefore disseminated word of it by telling certain employees and urging them to tell others. Uncontradicted testimony also establishes that Stockham told Betty that employees should eat in the lunch room. There is no evidence that plaintiff overheard this conversation between Stockham and Betty, or that she should have been expected to overhear it.[11] There is no evidence that Betty told plaintiff. This is found to be an understandable failure of plaintiff to "get the word" to be passed on. This single lunch room incident (considered alone or with other circumstances) is not shown to be a substantial or intentional act of discrimination. The notice of the inspection was short and the failure to notify plaintiff to eat in the lunch room may have resulted from unintentional oversight.

On the final and critical factual issue of whether plaintiff was discharged or whether she voluntarily quit, the evidence is conflicting. It was plaintiff's testimony that she was summoned to the office of the Personnel Manager, Mr. Davis, on August 28, 1967, and told she was laid off for lack of work. In her deposition, plaintiff made a contradictory answer stating the reason given was slow production. Davis denied he had discharged her but expressed some doubt about his ability totally to recall the events of this busy time period. Stockham testified that plaintiff announced that she was quitting at the close of the working day on August 28, 1967. Plaintiff's employment record contained both the notation that plaintiff voluntarily quit and the conflicting notation that she was laid off for lack of work. Karen Kenworthy, Davis' secretary, testified that plaintiff came into Davis' office some time after she voluntarily quit and asked that her employment record be changed to show that she was laid off for lack of work and that Davis consent-

11. Plaintiff, in fact, testified that Stockham "called Betty off" and apparently out of hearing distance of plaintiff, to tell her of the order to eat in the cafeteria.

ed and instructed Miss Kenworthy to make the change. Davis testified that he had no memory of such an incident.

■ In view of the conflict in the evidence between the testimony of defendant's agents, it is found that as the final act in a series of acts of discrimination to which plaintiff was subjected because of her race, was her discharge without reasonable cause. The record of plaintiff's termination which was made by defendant shows an entry in typewriting that she was "laid off" for "lack of work" on August 28, 1967. On the same record, a handwritten entry in parentheses after the "lack of work" notation states that "employee was voluntary quit." The evidence is uncontradicted that there was, in reality, no lack of work at the time of plaintiff's discharge.[12] No other employee was laid off for lack of work during this period.[13] The testimony of Davis, the Industrial Relations and Personnel Manager, was that work was available.

The testimony on the cause of the termination given by witnesses for the defendant is conflicting and inconclusive. Donald E. Stockham, foreman for defendant in the department where plaintiff worked, testified that plaintiff left the shop at quitting time (4 p.m.) on August 28, 1967, saying "I've had enough of this c——." It is found that plaintiff did make this remark. Stockham further testified that he had often heard other employees make the same statement at the close of the working day. Nevertheless, he seized upon the occasion to call Mr. Davis and advise him that plaintiff had quit. Stockham eagerly read too much into this explosive remark. According to Stockham's testimony, Davis replied that, under company regulations, plaintiff could not then be recorded as voluntarily quitting; he

would have to wait three days before recording the termination of plaintiff's employment.

Davis' testimony was substantially the same as that of Stockham to the effect that he had received a call from Stockham on August 28, 1967, stating that plaintiff had quit her employment; and that he advised Stockham that, under company regulations, he would have to wait three days to see if plaintiff returned to work before finally recording that her employment had been terminated. He further testified that he could not remember any circumstance of lack of work which would have justified the laying off of plaintiff on August 28, 1967; that he personally made the handwritten entry on plaintiff's employment record that "employee was voluntary quit"; and that he could remember no conference subsequent to August 28, 1967, in which plaintiff requested of him that her termination be recorded for lack of work. Davis' testimony was ambiguous and inconclusive on the question of whether his handwritten entry that plaintiff had voluntarily quit was made before or after the typewritten entry that she had been laid off for lack of work. At the trial of this cause, he testified that the entry was made before the typewritten entry, but in a deposition on oral interrogatories (which was introduced for impeachment purposes at the trial) he answered that he could not remember the order in which the entries were made. Further, Davis did not deny that he might have had a conference with plaintiff on August 28, 1967, although what took place in that conference is explained nowhere in the evidence except by plaintiff's testimony that Davis told her on that date that she was being terminated for lack of work or for slow production.[14]

---

12. Davis, defendant's personnel manager, testified that he could not remember "any circumstance of lack of work which would justify" the laying off of plaintiff on August 28, 1967.

13. Although the "factory employee turnover" records for the adjacent periods

of July 1 to July 31, 1967, and October 1 to October 31, 1967, show several layoffs for lack of work, none are shown, except plaintiff, for the period from August 1 to August 31, 1967.

14. As noted above, Davis could not recall the meeting, but admitted to some faulty

■ It is not decisive whether the contradictory testimony of Stockham and Davis effectively contradicts plaintiff's testimony that on August 28, 1967, she was called in and told that she was being discharged for lack of work or for slow production. Stockham's testimony that he informed Davis on the 28th that plaintiff had quit, if assumed to be correct apart from any testimony of plaintiff to the contrary, still supports the charge of discrimination against plaintiff. This finding is warranted because Stockham admitted that he had heard many employees leave the shop making statements similar to that which plaintiff purportedly made on August 28, 1967, and had not reported that they had quit. The separation notice (Plaintiff's Exhibit 9) stating "laid off for lack of work" was dated August 31, 1967 (but the entry on plaintiff's service record (Plaintiff's Exhibit 7) is dated August 28, 1967). Therefore, any notation that plaintiff voluntarily quit ·must have been made before three days had passed from date of August 28, 1967, in violation of company regulations.[15] Assuming that Stockham's testimony is correct that he reported that the plaintiff had voluntarily quit as a result of her explosive equivocal remark, it was a discriminatory act to record plaintiff's voluntary termination before company policy permitted it.

Defendant, however, has attempted to explain the conflicting entries regarding the discharge of plaintiff by offering the testimony of Mrs. Karen Kenworthy, secretary to Mr. Davis, to the effect that, some time after August 28, 1967, plaintiff came to the personnel office of defendant and requested of Mr. Davis that her discharge be listed as due to lack of work; and that Mr. Davis consented and instructed Mrs. Kenworthy to make the requested notation on the employment record. But Mrs. Kenworthy's testimony is not corroborated by either plaintiff or by Davis, both of whom testified that no meeting between them was held after August 28, 1967.[16] Mrs. Kenworthy may have been substantially correct, but may have been wrong about the date. Assuming Mrs. Kenworthy's testimony is correct, it does not contradict plaintiff's testimony that she was in fact discharged on August 28, 1967, for "lack of work" or for slow production. None of the oral testimony supports a conclusion that plaintiff was in fact terminated for lack of work. Further, Mrs. Kenworthy's testimony would not contradict Stockham's and Davis' testimony that plaintiff was listed as a "voluntary quit" without actually having quit before the 3-day waiting period had passed.

It is highly improbable that the premature warning of August 17, 1967, the unjustified lack of a locker assignment and the termination as "voluntary quit" could all happen only to the plaintiff in a period of nineteen days in the absence of racial discrimination. From all the evidence it is found that plaintiff was discharged as a result of racial discrimination.

■ It is therefore found that plaintiff was discriminatorily discharged by defendant because of her race in violation of Section 2000e–2, Title 42, United States Code,[17] after a brief employment

---

memory regarding the period. Stockham stated that plaintiff left work that day, stating she had had "enough of this c — — —." But that does not squarely contradict her testimony that she had meantime been called into Davis' office and informed of her discharge.

15. Davis, Stockham and Kenworthy all testified that the 3-day period had to be observed before one was recorded as terminated from employment.

16. Davis, in fact, apparently testified that no meeting was held after August 17, 1967, although he admits to a faulty memory regarding any subsequent occasions.

17. That section pertinently provides as follows:

"(a) It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

characterized by a pattern of racially discriminatory acts against plaintiff. Under the provisions of Section 2000e–5(g) of the same title, relief in the form of back pay can be granted a plaintiff for a violation of the Act, such as a discriminatory discharge, if the violation has been intentional. See Vogel v. Trans World Airlines (W.D.Mo.) 346 F.Supp. 805; Richards v. Griffith Rubber Mills (D.Or.) 300 F.Supp. 338. Defendant contends that no showing has been made in the case at bar that the violations were intentional. Defendant states:

> "Plaintiff, to be sure, alludes to a 'deliberate pattern of discrimination', but in doing so she is not at all convincing. Indeed, plaintiff employs a boot strap rationale of the first degree to reach the desired result. Plaintiff first claims that the incidents concerning the cafeteria request, the lockers and the 'charge of incompetence' demonstrate that the subsequent termination on August 28 was for discriminatory reasons. Under this theory the three situations preceding the termination so clearly demonstrate a pattern of discrimination, she asserts that the required unlawful motivation can be extended, without more, to the termination."

It is true that, under the Act, the burden is on the plaintiff to prove that a violation of the Act is intentional. See Vogel v. Trans World Airlines, *supra*; Dobbins v. Local 212, International Brotherhood of Electrical Workers (S.D.Ohio) 292 F.Supp. 413, 444. But intention is ordinarily provable by circumstantial evidence and inferable from prior repeated instances of similar acts by defendant. See 29 Am. Jur.2d, Evidence § 265 p. 314, n. 14. That is equally true under the Equal Employment Opportunity Act, with respect to which it is said that a prior pattern of discrimination may be probative of intention. Dobbins v. Local 212, International Brotherhood of Electrical Workers, *supra*. In the case at bar, the three proved instances of unwarranted discrimination against plaintiff constitute proof satisfactorily establishing the intent of defendant to violate the Act. Further, in some cases, it has been held that, in cases in which actual discrimination against Negroes is involved, requirements of proof of specific intent are to be relaxed. Clark v. American Marine Corp. (E.D.La.) 304 F.Supp. 603. It is not necessary, however, to apply that rule. Intention to violate the Act here is shown persuasively by the premature warning for slow production, by the failure effectively to assign plaintiff a locker, and in the overeagerness of Stockham to have plaintiff marked down as a "voluntary quit." Defendant, however, insists that no evidence is contained in the record in this case that any discrimination which might have occurred was carried out because plaintiff is a Negro. Defendant cites § 2000e–5(g), Title 42, U.S.C., to the effect that no relief is to be granted in cases in which a person was discharged "for any reason other than discrimination on account of race, color, religion, sex or national origin or in violation of Section 2000e–3(a) of this title." The facts in this case strongly support an inference and finding of racial discrimination. When the inference of discrimination because of race is warranted, defendant is not required to produce evidence to rebut the inference but it may contend, as here, that the discrimination was reasonable or warranted by reasons other than those of race. United States by Clark v. H. K. Porter Co. (N.D.Ala.) 296 F.Supp. 40, 106. The plaintiff has met the burden of proof that she was the subject of racial dis-

---

respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

crimination. So the case at bar is different from those cited by defendant for the proposition that "whether [plaintiff] was an unsatisfactory employee is not for this Court to decide." See Mead and Mount Construction Co. v. N.L.R.B. (C.A.8) 411 F.2d 1154; N.L.R.B. v. Grand Foundries, Inc. (C.A.8) 362 F.2d 702, 710; N.L.R.B. v. Monroe Auto Equipment Co (C.A.8) 368 F.2d 975. In this respect the case also differs from that of Sexton v. Training Corporation of America (W.D.Mo.) Civil Action No. 16992–1, relied on by defendant for the proposition that "the mere fact that plaintiff was a negro and was discharged does not establish a prima facie case of discrimination."

The defendant finally insists that plaintiff's testimony cannot be deemed credible for the following reasons:

"Plaintiff's trial testimony is contrary to her prior sworn statements. In fact, this is the first time in the course of this litigation that plaintiff testified she was told she was 'laid off for lack of work.' The formal written charge filed by plaintiff on September 7, 1967, with the Equal Employment Opportunity Commission, does not describe such an occurrence or attribute such a statement to the Company. By that document, plaintiff states the discrimination occurred on August 28, 1967, and describes the 'unfair thing' that was done as: 'I was told that I would be laid off *for the reason that my production was slow* . . .' When confronted with this statement at trial, plaintiff testified this statement must refer to a statement made on August 17, 1967. But this was contrary to her deposition testimony. In her deposition of April 21, 1970, plaintiff testified the statement in the EEOC charge was made to her in the personnel office on August 28. When asked at trial if this deposition was true, plaintiff said 'yes'. And when asked whether the statement in the charge was made to her on August 17 or August 28, plaintiff then testified that it was said on both dates. Plain-

tiff's complaint filed on January 21, 1970, alleges plaintiff was 'discharged' on August 28, 1967 (para. 3). The term 'layoff' was not used at all. In interrogatory answers filed February 24, 1970, plaintiff testified she was called into the main office on August 28, and was told that she 'was no longer going to work here' (Answer No. 1). Thus, we have at least three, probably four, different versions by plaintiff concerning her termination."

But there is no fatal inconsistency between plaintiff's deposition testimony, her pleadings and charges and any of her testimony in the trial of this case. In fact, the whole record, including the testimony of defendant's witnesses, corroborates plaintiff's factual contentions in the most important aspects regarding the August 17, 1967, premature warning, the locker incident and the premature recording of "voluntary quit" on August 28, 1967.

## The Hercules Record

■ Further, defendant claims that plaintiff has been impeached on the subject of her termination of prior employment at Hercules Powder Company by the testimony of Charles W. Pendergast, Personnel Manager of Hercules, that, contrary to plaintiff's testimony that she had been laid off at Hercules for "lack of work," that she had in fact been terminated for insufficiency of her performance. Considering this testimony of plaintiff to be untrue her credibility is not affected on the critical issues in which this judgment is based, or on which defendant's evidence is corroborative. The impeachment by the Hercules Personnel Manager has been considered although consideration is probably excluded by the "collateral issue" rule, McCormick Evidence, 1954 Ed., § 43, p. 89.

## The Fraud Question

The testimony of Mr. Pendergast, the Personnel Manager of Hercules, suggests serious questions of fraud not properly raised by the pleadings, pre-

trial orders, and proposed findings of fact. These questions include the following:

(1) what effect would fraud in the procurement of employment have on the liability of the defendant in this case?

(2) what effect would fraud in the procurement of employment have on damages in this case, if it did not bar recovery?

■ There is substantial evidence in the testimony of Pendergast that plaintiff intentionally misrepresented the causes of the termination of her employment with Hercules. But defendant neither pleaded (cf. Rules 8(c) and 9(b), F.R.Civ.P.) nor proved the essential elements of fraud in procurement of employment. Nor was the issue preserved in Pretrial Order No. 2. Therefore, this important issue was not presented in this case.

The only other issue in this case on which plaintiff's termination by Hercules might conceivably be relevant is that of damages. In applying for her position at Whitaker Cable Corporation, it might be argued that plaintiff may have been guilty of fraud in misrepresenting the reason for her termination by Hercules. Again, in the absence of pleading and proof of fraud, this issue is not considerable in this case.

### Damages

■ The following is the evidence adduced in the trial of this cause on the issue of damages:

(1) At the time of the termination of her employment with defendant, plaintiff was earning $1.65 an hour.

(2) After her termination from defendant, plaintiff earned the following amounts during the folowing periods of subsequent employment

(a) October 9, 1967, through December 11, 1967, she was trained at Manpower Development Training for typing, bookkeeping and secretarial work. Gross earnings: $ 67.20

(b) March 11, 1968, to March 14, 1968, Guarantee Foods. Gross earnings: 94.00

(c) April 8, 1968, to September 22, 1968, Butler Manufacturing Company. Gross earnings: 1,921.92

(d) October 7, 1968, to October 26, 1968, Gustin-Bacon. Gross earnings: 360.12

(e) December ?, 1968, to February ?, 1969, Commerce Bank. Gross earning: 745.85

(f) February 23, 1969, to April 1, 1969, National Catholic Reporter. Gross earnings: 204.82

(g) April 1969, Mathis Plumbing. Gross earnings: 158.00

(h) April 28, 1969, through June 4, 1969. Gateway Sporting Goods. Gross earnings: 450.10

Total · $3,999.01

On June 24, 1969, plaintiff obtained employment at Southwestern Bell Telephone Company at a higher rate of pay than she would have earned had she remained employed by defendant. Further, in Plaintiff's Exhibit 15, the parties have stipulated regarding the hourly wages which plaintiff would have received had she remained in the employment of the defendant. Davis stated the material wage rates. They yield the following sums which she might have earned:

| DATES | RATE OF PAY | | NO. OF | TOTAL |
| | HRLY. | DLY. | WORK DAYS | EARNINGS |
| --- | --- | --- | --- | --- |
| Aug. 29, '67–Oct. 7, '67 | $1.65 | $13.20 | 29 | $ 388.80 |
| Oct. 8, '67–Feb. 7, '68 | $1.835 | $14.88 | 87 | $1,294.56 |
| Feb. 8, '68–May 7, '68 | $1.865 | $15.12 | 63 | $ 952.56 |
| May 8, '68–June 7, '68 | $1.895 | $15.36 | 23 | $ 353.28 |
| June 8, '68–May 7, '69 | $1.965 | $15.72 | 237 | $3,725.64 |
| May 8, '69–Jun. 23, '69 | $2.20 | $17.60 | 33 | $ 580.80 |
| | | | Total | $7,295.64 |

Therefore, plaintiff is entitled to her back pay in the sum of $3,296.63, and a reasonable sum for attorney's fees, and her costs in bringing this action. Defendant opposes this award for the following reasons:

"Plaintiff bases this back pay upon the gross amount of her earnings at Whitaker Cable Corporation (including all increases subsequently scheduled under the collective bargaining agreement) minus her interim earnings. Plaintiff asks the court to find that she did not resume 'steady and equivalent employment' until June 24, 1969, and that she held only temporary interim jobs in the meantime. Actually this is untrue; plaintiff did not testify that any of the jobs she subsequently occupied were temporary jobs. In fact, it appears that with respect to her next four jobs, she voluntarily quit what would have been regular work. It also appears that at Butler Manufacturing Company, Gustin-Bacon and Commerce Bank she was earning more than she was earning at Whitaker Cable Corporation. (This is determined by dividing the number of days worked by the amounts earned and comparing it with the Whitaker Cable earnings based on $1.65.) Thus the back earnings which plaintiff requests did not flow from the allegedly wrongful discharge of plaintiff by Whitaker Cable but flowed from the fact that plaintiff voluntarily chose not to continue in the employment of four different employers thereafter. In addition, the record indicates that plaintiff rather than seeking equivalent employment was in school from October 9, 1967, to December 11, 1967, with Manpower Development. What plaintiff then seeks is that defendant act as her insurer—paying her regular earnings while she is in school and while she shops around from employer to employer voluntarily quitting many jobs until she is completely satisfied with her work. Not only is such a contention rejected by the law of damages but is rejected by the statute [Section 2000e–5(g), Title 42, U.S.C.] which provides interim earnings are to be deducted but also to be deducted are other amounts which would have been 'earnable with reasonable diligence'. Proper consideration of this factor greatly reduces the claims of plaintiff."

In Bowe v. Colgate-Palmolive Company (C.A.7) 416 F.2d 711, 721, however, it was held that the "grant of authority [in Section 2000e–5(g), *supra*] should be broadly read and applied so as to effectively terminate the practice [of discrimination] and make its victims whole" and that "all those who were discriminatorily (sic) laid off be compensated at the highest rate of pay for such jobs as they would have bid on/and qualified for if a non-discriminatory . . . scheme would have been in existence." The award of back pay in this case deducts the amounts that were earned after the unlawful discharge. There has been no showing under the statute that any other awards were "earnable with reasonable diligence." Plaintiff had a right to continue a search for permanent, equivalent employment. It does not appear, as defendant asserts, that any of the post-discharge employments were meant to be permanent. Normally, in awarding damages for a breach of contract of employment, it is only required that the nondefaulting party act reasonably so that he does not enhance damages. "To the extent that the nondefaulting party has not acted reasonably and has thereby failed to avoid certain consequences which are now claimed as damages, the party who is in default may show those consequences in reduction of damages." 22 Am.Jur.2d Damages § 204, p. 283. But defendant has made no such showing in the case at bar. Plaintiff testified that she quit Gustin-Bacon because she was unable to do the job; Commerce Bank because she was making less than $300 a month (which, in spite of defendant's contentions, is possible, in view of her earning $745.85 over a possible three-

month span) and Butler Manufacturing Company because the air conditioner repeatedly gave her colds. No evidence of unreasonable conduct after the discharge by defendant appears in this case.

For the foregoing reasons, it is Ordered and adjudged that plaintiff have and recover from defendant the sum of $3,296.63, her costs of this action and a reasonable attorney's fee. Jurisdiction is retained to determine the amount of the attorney's fee.