Samuel **TAYLOR**, and the class he represents, Plaintiff,

v.

**SAFEWAY STORES, INCORPORATED,** Defendant.

Civ. A. No. C–3051.

United States District Court, D. Colorado.

Sept. 18, 1973.

Kripke, Carrigan & Dufty, P. C., by Douglas E. Bragg, Denver, Colo., for plaintiff.

Holland & Hart, by William C. McClearn and R. Brooke Jackson, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

### I. Background

The individual plaintiff, Samuel Taylor, brings this claim for relief under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq. (1970), on behalf of himself and those similarly situated. Our first opinion in this case, 333 F.Supp. 83 (D.Colo.1971), denied the defendant's motion to dismiss the class action and ordered the suit maintained pursuant to F.R.Civ.P. 23. Subsequently, by order dated November 13, 1972, we limited the plaintiff class to "Negro persons who are employed, have been discharged, have sought employment, or who may seek employment at Safeway's frozen food warehouse in Denver."

The gravamen of the plaintiffs' amended complaint is that the defendant by and through its agents discriminated against the plaintiff Taylor and members of the class he represents in the matters of hiring, training, discharging, and certain other facets of the employment relationship. For himself, the plaintiff Taylor seeks back pay and reinstatement with the Safeway organization in a position commensurate with his present education and skills; for the class, he seeks a permanent injunction prohibiting Safeway and its agents from discriminating on the basis of race against members of the class in all aspects of the employment relationship. His prayer for back pay on behalf of the class has been stricken from the complaint.

The evidence reveals that Taylor applied on several occasions for employment with Safeway and was hired on a probationary basis as an order selector in Safeway's frozen food warehouse in Denver. He was so employed for three weeks, during which time he was trained and expected to progress toward the required production standard. Mr. Taylor kept largely to himself, asking neither help nor advice from the other employees. The evidence also reveals that on one occasion his work was criticized by his foreman Walker, that Walker's attitude toward blacks in his charge was generally hostile, and that Walker pursued a practice of favoring some employees over others in the distribution of order assignments. The evidence finally discloses that Walker discharged Taylor before the end of his probationary period for low production on the basis of records that Walker himself maintained and that the discharge was approved by Walker's superiors, Alcola and Scherzer.

### II. Plaintiff's Individual Claim

At the outset the plaintiff Taylor need only make a prima facie showing that some unlawful discrimination was practiced against him in the course of the employment relationship. McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). For his cause of action Taylor alleges that Safeway, by and through its agents, practiced discrimination against him by refusing at first to hire him, failing to train him adequately for his job, discharging him without cause, and refusing to rehire or transfer him. We shall examine each of these allegations in turn and conclude as to each whether the plaintiff has established a prima facie case of discrimination.

### A. Hiring

Taylor alleges that prior to his employment by Safeway he interviewed for jobs with the company and was told by Scherzer, Safeway's distribution center manager, that there were no jobs available. No evidence has been adduced to persuade us that Scherzer's assertion was less than truthful. Absent proof that there were in fact jobs available and that whites were hired to fill them while blacks were turned away, the

plaintiff's claim of racial discrimination as to hiring cannot prevail. *See* McDonnell-Douglas Corp. v. Green, *supra*. Moreover, we think that Safeway demonstrated by hiring Taylor when a job became available that it pursued no policy of racial discrimination in hiring. We therefore find no merit in this claim.

## B. Training

◼ Taylor further alleges that Safeway trained him for his job as an order selector in a manner which was not only inadequate, but also inferior to the manner in which whites were trained. There is no evidence that this was the case. On the contrary, the plaintiff received his training from the same man who trained the majority of the new employees, a man who had a reputation among the other employees as a good and competent worker. Customarily, new employees received about a week's training before assuming full responsibility for their performances; Taylor received four days of instruction. Moreover, Taylor himself testified that the essentials of the job were not difficult to learn, and he apparently felt no need to seek help from the other employees. We therefore have no reason to believe that Taylor's training disadvantaged him in the later performance of his work.

## C. Discharging

◼ Taylor still further alleges that he was discharged from his employment by Walker, his foreman and immediate supervisor, for the sole reason that he is a black man. We believe that a prima facie case of racial discrimination in such cases is established by proof of the following elements: (1) that the plaintiff is a black man, (2) that he was discharged, and (3) that the person who discharged him was predisposed to discriminate against blacks. *See* Lowry v. Whitaker Cable Corp., 348 F.Supp. 202 (W.D.Mo.1972), aff'd 472 F.2d 1210 (8th Cir. 1973). As to the first two elements there is no dispute. As to the

third element we believe that the evidence supports a finding that Walker looked unfavorably on blacks and that such attitude was operative in his capacity as foreman for Safeway. At one point Walker is alleged to have said words to the effect that he would not tolerate more than one black man working for him at a time. Walker denies having made that statement. Nevertheless, we are persuaded that Walker's attitude toward blacks was adverse. A black former employee, Nash, testified that Walker's continual harassment and avowed intention to have him fired had induced him to leave Safeway's employ. Another black former employee, Grant, also complained of Walker's treatment of him. This testimony regarding Walker's attitude toward blacks was corroborated by that of Potter, Safeway's former employment relations manager, who noticed Walker's lack of receptivity to company programs designed to encourage sensitivity to minority problems. Finally, we think that the fact that Taylor was discharged by Walker after completing only three weeks of the initial four-week probationary period, when to do so was not the usual practice, adds cogency to the plaintiff's assertion that his discharge was prompted by racial prejudice. *Cf.* Lowry v. Whitaker Cable Corp., *supra*.

◼ In summary, then, we hold that the plaintiff has made out a prima facie case of racial discrimination in the matter of his discharge from employment by Safeway. In McDonnell-Douglas Corp. v. Green, *supra*, the Supreme Court held that once the plaintiff makes a prima facie showing of discrimination prohibited by Title VII, ". . . [t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason . . ." for its action. While the Court does in one instance allude to the employer's "burden of proof at this stage," we take it that what is meant by this phrase is, in fact, the burden of going forward, of advancing " . . . some legitimate, nondiscriminatory reason . . . " for its

conduct. In the event that the defendant fails to advance such a reason, the court must render judgment for the plaintiff. *See* J. Wigmore, Evidence, § 2494(I)(1) (3d ed. 1940). That case, however, is not before us.

■ The defendant contends that Taylor was terminated within his probationary period for failure to meet required production standards. The record contains the production records supporting this contention. They show on their face that Taylor's production averages were substandard, to say the least. We hold that the defendant has thus overcome the force of the plaintiff's prima facie case and that it has discharged its burden to go forward at this stage.

■ But, as *McDonnell-Douglas* teaches, the inquiry does not end here. The burden of going forward now shifts back to the plaintiff. At this point, however, the only issue remaining before the court is whether the reason advanced by the defendant, i. e. poor work performance, was merely a pretext for a course of conduct prohibited by Title VII. *See* McDonnell-Douglas Corp. v. Green, *supra*. The issue of pretextuality compels us to confront the most difficult question of fact presented by this case. Obviously, if the production records maintained by Walker were genuine, accurate, and reliable, it cannot be said that Taylor's low production was a mere pretext for firing him, provided, of course, that whites with comparable production records were also fired. The incapacity or failure of an employee to perform according to a standard set for whites and non-whites alike constitutes sufficient cause to discharge him. But if the records were fraudulent, inaccurate, or otherwise unreliable, and if they were intended or known to be so, it cannot be said that low production was anything but a pretext for discharging the plaintiff on account of his race. The evidence discloses that the order selectors employed in Safeway's frozen food warehouse somehow received assignments to select quantities of frozen food items from their storage places in the warehouse and to deliver them to the appropriate place in the warehouse for shipment to retail stores in the Denver division. It also appears that employees were judged on their production by the number of pieces selected per hour spent in selecting orders. It is somewhat unclear, however, just how the order assignments were given to them. The evidence is conflicting on this point. Taylor testified that Walker, as foreman, kept the orders in his possession and distributed them to the order selectors as they became available to fill them. Archie Grant testified that Walker retained control over assignments in order to favor certain of the men with large orders in order to keep their production averages high. It seems that by selective order assignments Walker could manipulate, or at least influence, production averages. That he had the opportunity and disposition to use this power so as to discriminate against Taylor is apparent from the evidence. Walker, however, denied retaining control over the order assignments and testified that they were left unattended so that the order selectors could pick up the card on top of the pile. In light of all the evidence and our judgments concerning the credibility of the witnesses, we are compelled to resolve this question in favor of the plaintiff. We find that Walker did retain sufficient control over order assignments to influence the production averages of his men. This conclusion is borne out by our independent examination of the records, which disclosed the following facts: (1) that during the first four days of Taylor's employment, when Taylor accompanied his trainer on the job, the orders selected by them consisted on the average of 227.3 pieces per order, as compared with 200.0 pieces per order, the average for all order selectors, (2) that on the fifth through fifteenth days, when Taylor was on his own in the warehouse, the orders selected by him consisted on the average of 191.9 pieces

per order, as compared with 228.9 pieces per order, the average for all order selectors, and (3) that not only was Taylor's daily average of pieces per order lower on *every* day than the daily averages for all order selectors, but it was lower by more than 16% on the average of those 11 days. Archie Grant, who had an opportunity to observe Taylor's work on nine days, testified that Taylor was being assigned to small and, at best, medium-sized orders. We also notice from our own review of the records that the very large orders were almost always assigned to a few, seemingly favored, men and never to Taylor. The effect of Walker's practice of selective assignments was, by our calculations, to keep Taylor's production averages, figured in pieces per hour, abnormally low. Taylor's weekly averages, as computed by the company, were 91.4, 84.3, and 91.7 pieces per hour. Had he received orders of average size, his average weekly production could have been as high as 124.6 pieces per hour. On this assumption, his projected average would have placed him in a range such that after the fourth week he might have attained the minimum average expected of order selectors in 1968, i. e. about 135 pieces per hour. Thus we find from our analysis of the production records the likelihood that Walker in fact manipulated them with the effect that Taylor was discriminated against in the matter of his discharge from employment. The degree of discrimination was, furthermore, significant in that Alcola, the frozen food warehouse manager, testified that had Taylor's averages been over 100 pieces per hour, he might have kept Taylor on for the fourth week and given him another chance to prove himself. Alcola noted, however, that with his averages as recorded to that date, Taylor could not have been expected to reach 135 pieces per hour and that keeping him on would have been futile. The evidence further shows that men with averages in excess of 100 pieces per hour were permitted to stay on a fourth week at least

and that no man had ever been fired after only three weeks probation.

In order to find that Taylor's unsatisfactory production record was merely pretextual, this court need not find that Walker's practice of selective order assignments had as its specific design to discriminate against Taylor. *See* Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1970). It might be said, however, that such a finding seems not unwarranted. All that the plaintiff need show is that Walker was prejudiced against blacks, that he was known to be so by the company, that the records kept by him were inherently unreliable as indicators of Taylor's performance, that the circumstances of Taylor's discharge were such as to prompt inquiry into the basis for the discharge by Walker's superiors, Alcola and Scherzer, and that the latter failed to investigate beyond the facts as represented to them by Walker and quickly acquiesced in Walker's determination that Taylor should be fired. We find that the plaintiff has sustained this burden, and we so hold.

### D. Refusing to Rehire or Transfer

Finally, Taylor alleges that Safeway refused to rehire him after his discharge for the sole reason that he is a black man. We think that this issue is merged in the issue of the propriety of Taylor's discharge. If the discharge and the subsequent refusal to rehire were the products of racial discrimination, as Taylor contends, they are in effect the same wrong. So, too, if the discharge was for good cause, then the refusal to rehire him cannot be deemed unlawful. The plaintiff apparently relies on McDonnell-Douglas Corp. v. Green, *supra*, for the proposition that the failure to rehire is a wrong independent from the discharge itself. We suggest that it is only the peculiar facts of that case that make it so. There the respondent was refused re-employment on the grounds of his participation in certain illegal activities directed against the company, which occurred subsequent

to his discharge on other grounds. In the case at bar the grounds for Taylor's discharge and Safeway's refusal to re-hire him arose from the same set of circumstances. They were in effect one and the same.

Taylor also contends in this regard that Safeway's refusal to transfer him to another department in the company after having discharged him was calculated to exclude him as a black man from such other departments. We cannot agree. A transfer following his discharge would have been of the same effect as a rehiring. Taylor was at one time informed that if he could not do the work in the frozen food warehouse, he could not make it elsewhere in the company. The case of Griggs v. Duke Power Co., *supra,* is of no assistance to the plaintiff. *Griggs* makes it clear that a no-transfer policy is only illegal to the extent that it is discriminatory in effect. In this case there is no evidence whatsoever that Safeway's no-transfer practice was applied in such a manner as to discriminate against Taylor. On the contrary, the evidence shows rigorous application to all, irrespective of race. So far as we have been able to determine, only one exception has ever been made to this practice. That was in the case of Herbert Nash, a black man, who was permitted to transfer from salvage to frozen foods. The subject of the no-transfer practice will be reconsidered *infra* in connection with the class claim, but for the present we conclude that the practice did not operate to deny Taylor any protected right. He therefore has no grounds to complain of it.

### III.   Plaintiffs' Class Claim

We turn next to the claim of the class. Like the individual plaintiff, the class alleges discrimination by the management of Safeway generally in hiring, training, and discharging blacks. It also complains specifically of several company policies and practices, namely, the employee referral system, the policy of giving preference to applicants experienced in warehouse operations, and the practice of permitting no inter-departmental transfers. We shall consider these general and specific complaints together insofar as it may be appropriate to do so.

### A.   Hiring

The plaintiff class alleges that Safeway has systematically denied equal employment opportunities to members of the class and offers the following arguments to prove discrimination in hiring:

1.   The percentage of blacks employed by Safeway is significantly lower than the percentage of blacks in the Denver labor force.

At the outset we think it inappropriate to use as a referent population for purposes of statistical comparisons the labor force of the city and county of Denver. Instead, we think that the percentage of blacks employed by Safeway must be compared to the percentage of blacks living in the Standard Metropolitan Statistical Area (SMSA), the five-county area consisting of Denver, Adams, Arapahoe, Jefferson, and Boulder counties. Ours is a highly mobile society, and Safeway's distribution center is accessible by high-speed thoroughfares from the outlying suburban counties. Noticing the likelihood that persons employed by Safeway may live anywhere in the entire metropolitan area, we find that the SMSA population is the appropriate one for purposes of statistical comparison in this case.

The evidence shows that in the years shown below blacks were hired in the following percentages to the total number of persons hired:

| | |
|---|---|
| 1968 | 22% |
| 1969 | 0% |
| 1970 | 15% |
| 1971 | 15% |
| 1972 | 37% |
| Average | 18% |

According to the 1970 U. S. Census, the percentage of blacks living in the SMSA for the same period was about 4.1%. Comparison of these figures compels our conclusion that the statistics adduced do not establish a prima facie case of ra-

cially discriminatory hiring practices by Safeway.

2. Safeway's policy of preferring job applicants with warehousing experience constitutes an invidious discrimination against blacks, who as a class are less likely to have such experience.

There is nothing so far as we can determine in the provisions of Title VII that outlaws even by implication relevant work experience as an employment criterion. On the contrary Griggs v. Duke Power Co., *supra,* ordains that an applicant's qualifications shall be the sole proper basis for hiring decisions. Only when employment is based on qualifications without regard to race, color, religion, sex, or national origin will the aim of the Civil Rights Act be realized. But even accepting, for the sake of argument, that the preference for experience works an invidious discrimination against blacks, there is insufficient evidence on the record for us to conclude that this preference was a substantial factor in the selection of warehouse applicants as a group, or indeed that the preference was discriminatory in effect. We therefore find this argument lacking in merit.

3. The employee referral system as used by Safeway was a discriminatory and illegal employment practice.

In support of this contention the plaintiffs cite United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973), where an employee referral system was held illegal inasmuch as it operated to preserve the low percentage of blacks then employed by the company. Another case of like import is Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970). We think that such cases are distinguishable. There employee referral was the primary means for recruiting applicants. In the case at bar, employee referral was but one such means, and an insubstantial one at that. Job applicants were recruited by other means as well, from the state employment agency, by newspaper advertisements, and from among "walk-ins," to name only the most significant. Hence, we conclude that the employee referral system did not operate to exclude blacks from employment and therefore was not discriminatory in effect.

## B. Training

The plaintiffs next urge that Safeway discriminated against the class by training blacks in a manner inferior to that in which whites were trained. The record is devoid of evidence on this claim, and so we dismiss it out of hand.

## C. Discharging

The plaintiffs finally contend that Safeway practiced discrimination against blacks in the matter of discharges. The evidence shows that the percentage of discharges involving blacks does not correspond to the percentage of black employees:

| Discharges Involving Black Employees | | Black Employees |
|---|---|---|
| 1968 | 33% | 4% |
| 1969 | 0% | 4% |
| 1970 | 13% | 3% |
| 1971 | 13% | 3% |
| 1972 | 30% | 9% |
| Average | 18% | 5% |

Normally, statistics are entitled to great weight as evidence of a discriminatory practice. Ochoa v. Monsanto Co., 473 F.2d 318 (5th Cir. 1973). A significant statistical disparity may even amount to a prima facie case such as to shift the burden of going forward to the defendant. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970), cert. den., Lee Way Motor Freight v. Jones, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971). But here we think that the relevant populations are so small as to weaken any inference of racial discrimination that might otherwise be drawn from them. The total number of non-supervisory employees in the frozen food warehouse between 1968 and 1973 ranged from 25 to 36 and averaged about 30. Accordingly, we cannot conclude that the above-quoted figures reveal a significant statistical disparity. *See* Ochoa v. Monsanto Co., *supra.* We

therefore hold that the plaintiffs have failed to make a prima facie showing of racial discrimination in discharging black employees. Even if the plaintiffs had made such a showing, there appear in the record legitimate and non-discriminatory reasons for discharging the employees in question. We are not convinced that the class action is the appropriate means for trying the pretextuality of these several and diverse reasons, but we need not decide that question. The plaintiffs have not met their burden of proof by a preponderance of the evidence that the reasons advanced by the defendant were in fact pretextual.

 The matter of the no-transfer practice may be otherwise resolved. The plaintiffs allege that by means of the company's no-transfer policy or practice blacks were concentrated in the menial, although good-paying, jobs and denied the opportunity to move up to positions in Safeway's retail stores. Griggs v. Duke Power Co., *supra,* cited by the plaintiffs for the proposition that a no-transfer policy which operates to preserve existing segregation of blacks is illegal, is not in point. That case involved a pre-existing pattern of discrimination in four departments of the company which was preserved by a requirement that new labor enter the company through a fifth department and advance by transfer. Transfer was conditioned upon passing a test which was inherently discriminatory against blacks. The Supreme Court held that such barriers to employment are in violation of Title VII. The instant case presents very different circumstances. Here there is no showing of any history of discrimination by Safeway in the employment of blacks in the retail stores which was sought to be preserved by means of the practice. The ostensible purpose of the practice was to reduce turnover and eliminate the necessity and expense of retraining employees for new jobs. Whether these are sufficient business reasons we need not decide in view of our conclusion that no prior pattern of discrimination was sheltered by the prohibition of transfers. *Compare* Jones v. Lee Way Motor

Freight, Inc., *supra.* Thus we conclude that Safeway's no-transfer practice is not proscribed by *Griggs* and *Jones.*

### IV. Damages

No evidence as to damages was taken at trial. Therefore, this case will be set for further hearing on the matter of damages on notice to the parties. We note, however, from the record that since his discharge by Safeway, the plaintiff Taylor has earned a bachelor's and a master's degree in audiology. Consequently and understandably, he does not wish to return to employment with Safeway as an order selector in the frozen food warehouse in Denver. We therefore hold that the relief to which he may be entitled is back pay and attorney's fees in amounts to be determined on receipt of further evidence.

### V. Judgment

This memorandum opinion shall constitute the court's findings of fact and conclusions of law pursuant to F.R.Civ. P. 52. Judgment will be entered for the plaintiff Taylor on his individual claim in an amount as yet undetermined and for the defendant on the class claim.