Sarah L. ABRON

v.

**BLACK AND DECKER MANUFACTURING COMPANY.**

Civ. No. Y–75–539.

United States District Court,
D. Maryland.

Oct. 11, 1977.

**1098**

Norris C. Ramsey, Karon D. Ramsey, Baltimore, Md., for plaintiff.

Stephen D. Shawe, Arthur M. Brewer, Baltimore, Md., for defendant.

## MEMORANDUM OPINION

JOSEPH H. YOUNG, District Judge.

This action, filed under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and under 42 U.S.C. § 1981, concerns claims of racial discrimination against the Black and Decker Manufacturing Company at its Hampstead, Maryland plant. The plaintiff, Sarah Abron, brought this action on behalf of herself and a class which was certified by this Court, pursuant to Rule 23 F.R.Civ.P., to include all black persons who either have been employed, are currently employed or will be, or will seek to be, employed by the defendant at its Hampstead plant on or after January 31, 1971. By prior Order of November 24, 1975, this Court held that the plaintiff had satisfied the requirements of Title VII for the filing of a charge with the Equal Employment Opportunity Commission and had timely filed her complaint in federal court upon receipt of a "right-to-sue" letter. Subject matter jurisdiction over this action is therefore proper under 42 U.S.C. § 2000e–5(a) and (e) as well as under 42 U.S.C. § 1981. General jurisdiction is properly invoked under 42 U.S.C. § 2000e–5(f) and 28 U.S.C. §§ 1343, 2201 and 2202.

The complaint, as amended, alleged discrimination in employment in the areas of recruitment; job classification; hiring; assignment; promotion; transfer; benefits, compensation, terms, conditions and privileges of employment and in the apprenticeship program conducted by the defendant. Claims concerning layoff, recall, discipline and discharge were abandoned by the plaintiff.

The relief sought is a declaratory judgment that the actions of the defendant have violated the civil rights of the class under the statutes cited above, a preliminary and permanent injunction prohibiting the defendant from further engaging in discriminatory activities and equitable remedies in the form of back pay and adjustment of class members' positions as employees of the defendant company to reflect their "rightful place" in the absence of discrimination. With the parties in agreement, the

Court on March 11, 1977 granted the plaintiff's motion pursuant to Rule 42 F.R.Civ.P. that the issue of liability be severed from that of back pay awards and the latter tried by a Special Master should the Court make a finding of liability.

At the Court's request, the parties made arrangements for notification to potential class members of the pendency of this action, although this was not a requirement under Rule 23 F.R.Civ.P. since the class had been certified as a (b)(2) class. Current employees of the defendant were notified directly and advertisements were placed in a newspaper of general circulation in the Baltimore, Maryland community in advance of trial.

A trial on the merits was held April 18–22, 1977 with additional evidence of expert witnesses heard on April 29, 1977 and May 10, 1977. As a preliminary matter, the Court made an oral ruling that the individual plaintiff's request for assessment of punitive damages would be denied in light of such decisions as *E.E.O.C. v. Detroit Edison,* 515 F.2d 301 (6th Cir. 1975) (appeal pending before the Supreme Court), *United States v. N. L. Industries,* 479 F.2d 354 (8th Cir. 1973), and *Pearson v. Western Electric Co.,* 542 F.2d 1150 (10th Cir. 1976). The Court also considered the motion of the plaintiffs to strike the defendant's supplemental answers to interrogatories and its response to the plaintiffs' request to admit facts. The plaintiffs' motion was made as a result of the defendant's eve-of-trial announcement that facts and figures which it had supplied in prior responses to the plaintiffs' interrogatories were erroneous. Plaintiffs' counsel had, understandably, relied upon the earlier responses to develop statistical exhibits for submission at trial. The earlier answers to interrogatories had also been referred to in the Pre-Trial Order which the parties had submitted to the Court and which had been signed by defendant's and plaintiffs' counsel. This Court made clear at trial its firm disapproval of the manner in which counsel had handled discovery, and considered it within its power to exclude the most recent factual and statistical materials presented by defendant's counsel and to admit only that evidence which had been produced earlier by the defendant, after two motions to compel were filed by the plaintiff and one Rule 37 Order issued by this Court. However, satisfied that the interests of justice and the parties would not be served by consideration of material that might be erroneous, the Court denied the plaintiffs' motion to strike and ruled on admission of certain evidence, throughout the trial, based upon whether the plaintiffs were given information sufficiently in advance to permit their counsel to cope with it. *Cf. Tupman Thurlow Co. v. S. S. Cap Castillo,* 490 F.2d 302 (2d Cir. 1974).

Based upon the testimony and the documentary evidence, the Court makes the following findings of fact and determinations of law:

The defendant, the Black and Decker Manufacturing Company [B & D], operates a large industrial plant in Hampstead, Maryland where it engages in the manufacture of power hand tools and parts. It has conducted this operation in Hampstead since the early 1950's, and has increased the size and output of the plant considerably since it was opened. In the mid-1960's, the defendant centralized all of its manufacturing operations in the Hampstead plant and the Towson branch of the company is now reserved for administrative functions. There are approximately thirty departments within the Hampstead plant, most of which are concerned with the various processes of designing and assembling and packing the tools. There are in addition, warehouse, distribution and personnel departments, the latter of which contains the cafeteria operations, a finance division, an "off-load" department, various engineering services and "shops", maintenance services, a quality control department or division and a plant services department. [Plaintiffs' exhibits 11(a)–(d); Testimony of Samuel H. Patterson, personnel manager at the Hampstead plant 1969–1973.] B & D assigns its employees to job classifications, of which there are approximately 300. [Testimony of James A. Cornelison, manager of personnel services B & D Hampstead plant.]

These job classifications have assigned labor grades which designate the pay rate ranges. Utilizing the groupings employed by the Equal Employment Opportunity Commission [EEOC], B & D considers its labor grades 2 and 3 to be Laborers, its labor grades 4–6 to be Operatives, its labor grades 7–14 to be Craftsmen and its labor grades S24–12 (the lower number indicating the higher grade) to be Technicians and Office and Clerical staff. [Plaintiffs' exhibit 7a; testimony of Cornelison.] B & D hires almost all of its employees at entry job grades 3 or 5. Absent promotion or transfer, it is possible, with satisfactory or better job performance reviews (see below), to move only one or two steps up from entry level job grade, that is, to no higher than levels five or seven. [Deposition of Cornelison, 69–71.]

In response to the plaintiffs' requests for discovery, the defendant supplied three separate sets of data indicating the racial composition of B & D's work force on various dates. The first set of data, consisting of the EEO–1 forms submitted by B & D to the EEOC for various employment years is contained and summarized in plaintiffs' exhibits 1, 2a, 2b, 3 (column A), 11g, 11h & i (column A) and 11j (Chart I). The second set of data appears in the First Supplemental Answers to plaintiffs' interrogatories and is contained and summarized in plaintiffs' exhibits 3 (column B), 8, 9, 11a–f, 11h–i (column B) and 11j (Chart III). The third set of data appeared in the attachments I–VIII to the defendant's Second Supplemental Answers to plaintiffs' interrogatories and is the material which the defendant's counsel indicated at the beginning of trial was erroneous. Although it has been admitted into evidence, it has not served as the factual basis of the Court's determinations here. In addition to the data mentioned above, there was a stipulation by the parties at trial that the following were accurate figures for the total work force employed and the percentage of black employees for the given dates:

| DATE | NO. OF EMPLOYEES | NO. BLACK | % BLACK |
|---|---|---|---|
| March '69 | 3,021 | 62 | 1.9 |
| May '70 | 3,014 | 62 | 2.1 |
| May '71 | 2,757 | 57 | 2.1 |
| April '72 | 2,693 | 62 | 2.3 |
| April '73 | 2,915 | 74 | 2.5 |
| April '74 | 3,038 | 105 | 3.5 |
| April '75 | 2,886 | 101 | 3.5 |
| Jan. '76 | 2,336 | 60 | 2.5 |
| March '77 | 2,485 | 74 | 3.0 |

Examination of plaintiffs' exhibits 1, 2a and 3 reveals the following statistical picture:

| YEAR | OCCUPATION | TOTAL # EMPLOYED | WHITES* | BLACKS | % BLACK |
|---|---|---|---|---|---|
| 1963 | Officials/Managers | 120 | 120 | 0 | 0 |
|  | Professional | 134 | 134 | 0 | 0 |
|  | Technical | 93 | 93 | 0 | 0 |
|  | Sales | 6 | 6 | 0 | 0 |
|  | Office/Clerical | 340 | 339 | 1 | .3 |
|  | Craftsmen | 801 | 800 | 1 | .1 |
|  | Operatives | 827 | 815 | 12 | 1.5 |
|  | Laborers | 92 | 89 | 3 | 3.3 |
|  | Service Workers | 85 | 44 | 41 | 48 |
| 1970 | Officials/Managers | 138 | 138 | 0 | 0 |
|  | Professional | 97 | 97 | 0 | 0 |
|  | Technicians | 34 | 34 | 0 | 0 |
|  | Office/Clerical | 160 | 158 | 2 | 1.3 |
|  | Craftsmen | 982 | 976 | 6 | .6 |
|  | Operatives | 1234 | 1218 | 16 | 1.3 |

| YEAR | OCCUPATION | TOTAL # EMPLOYED | WHITES * | BLACKS | % BLACK |
|------|-----------|------------------|----------|--------|---------|
| 1970 | Laborers | 306 | 286 | 20 | 6.5 |
|  | Service Workers | 63 | 45 | 18 | 28.6 |
| 1971 | Officials/Managers | 174 | 174 | 0 | 0 |
|  | Professionals | 101 | 101 | 0 | 0 |
|  | Technicians | 30 | 30 | 0 | 0 |
|  | Office/Clerical | 159 | 157 | 2 | 1.3 |
|  | Craftsmen | 1030 | 1024 | 6 | .6 |
|  | Operatives | 1046 | 1026 | 20 | 1.9 |
|  | Laborers | 155 | 142 | 13 | 8.4 |
|  | Service Workers | 62 | 46 | 16 | 25.8 |
| 1972 | Officials/Managers | 204 | 204 | 0 | 0 |
|  | Professionals | 88 | 88 | 0 | 0 |
|  | Technicians | 30 | 29 | 1 | 3.3 |
|  | Office/Clerical | 131 | 129 | 2 | 1.5 |
|  | Craftsmen | 1025 | 1017 | 8 | .8 |
|  | Operatives | 1001 | 975 | 26 | 2.6 |
|  | Laborers | 161 | 149 | 12 | 7.5 |
|  | Service Workers | 53 | 40 | 13 | 24.5 |
| 1973 | Officials/Managers | 198 | 198 | 0 | 0 |
|  | Professionals | 102 | 100 | 2 | 2.0 |
|  | Technicians | 27 | 27 | 0 | 0 |
|  | Office/Clerical | 143 | 141 | 2 | 1.4 |
|  | Craftsmen | 1029 | 1021 | 8 | .8 |
|  | Operatives | 1100 | 1066 | 34 | 3.1 |
|  | Laborers | 262 | 247 | 15 | 5.7 |
|  | Service Workers | 54 | 41 | 13 | 24.1 |
| 1974 | Officials/Managers | 203 | 202 | 1 | .5 |
|  | Professionals | 99 | 97 | 2 | 1.2 |
|  | Technicians | 29 | 29 | 0 | 0 |
|  | Office/Clerical | 140 | 138 | 2 | .7 |
|  | Craftsmen | 1029 | 1022 | 7 | .8 |
|  | Operatives | 1248 | 1194 | 54 | 4.9 |
|  | Laborers | 233 | 107 | 26 | 11.2 |
|  | Service Workers | 57 | 44 | 13 | 22.8 |
| 1975 | Officials/Managers | 205 | 203 | 2 | 1.0 |
|  | Professionals | 83 | 82 | 1 | 1.2 |
|  | Technicians | 29 | 29 | 0 | 0 |
|  | Office/Clerical | 143 | 142 | 1 | .7 |
|  | Craftsmen | 1035 | 1027 | 8 | .8 |
|  | Operatives | 1152 | 1096 | 54 | 4.9 |
|  | Laborers | 185 | 161 | 24 | 13.0 |
|  | Service Workers | 54 | 45 | 9 | 16.7 |

* Includes all non-blacks.

---

Examination of plaintiffs' exhibits 8 and 9, and 11(a)–(d) reveals that blacks who were employed by B & D were *not* assigned to work 25 of 43 departments in 1965 (58.1%), 18 of 34 departments in 1968 (53%), 21 of 35 departments in 1971 (60%) and 15 of 36 departments in 1974 (42%). Furthermore, blacks in those years were employed in one department—plant services—in markedly higher proportion than they were in any other department or in relation to the percentage of all black employees in the

total work force. Within the plant services department, blacks have with two exceptions been classified as custodians, a "service worker" EEOC classification and the lowest B & D job level. In one year (1968), one black was assigned a "laborer" job grade and in 1971 and 1974 one black was in a position assigned a "craftsmen" job grade. By B & D's own job description the "custodian" position is a janitorial function:

> keeping an assigned area of the Hampstead Plant clean, orderly and in a sanitary condition by performing a variety of housekeeping functions which involves working under disagreeable conditions and heavy physical effort; removes oily and dirty scrap metal and other materials, operates hand and power driven cleaning equipment and/or operates and cleans the incinerator.

[Plaintiffs' Exhibit 31.] It is also clear from defendant's Second Supplemental Answers to Plaintiff's Interrogatories, Answer to Interrogatory 46 (Exhibit IX to the Answers), that the job of custodian is in fact a "dead-end" position, since it prepares an employee by providing "the job knowledge, skill and experience" to qualify for one of the few positions of grounds "group leader". The Court finds there is no "career counselling" of any meaningful value or effect for those in custodian positions.

Departments 20 and 24 are the packing and packaging departments at B & D. Together they are the departments with the highest percentage of the lowest pay level jobs. Further, the Court finds that despite the suggestion, from defendant's job progression description contained in Exhibit IX to the defendant's Second Supplemental Answers to Plaintiff's Interrogatories, that the low level jobs of packer C–A in either Department 20 or 24 may provide "job experience", knowledge or skill for positions in that department with a labor grade above 7, in fact there are few truly "skilled" jobs available for those who have gained job experience in these two departments and the skills (in packing) do not translate into knowledge which is of use in obtaining jobs in other departments where tool manufacturing, assembly of parts and design are conducted and in which the better, more lucrative job opportunities exist. In the data provided by the defendant in answer to Interrogatories 10 and 11 of the plaintiff [Plaintiffs' exhibit 8], considering only the "best" year of B & D's hiring and assignment of black employees—1974—it is clear that a larger percentage of blacks were assigned to Departments 20 and 24 (41 of 117 blacks employed or slightly over 35%) than whites (578 of 2926 or slightly under 20%). When the assignment to Departments 20 and 24 is combined with the assignment to the plant services department, which has been discussed as a non-desirable placement from the standpoint of employee opportunity, the comparison between the quality of the black and white assignments becomes even more dramatic. 52 of 117 blacks in 1974 were assigned to the three departments, or 44%, while 593 of 2926 whites were so assigned, or 20%. Within Departments 20 and 24, 63% of the blacks were assigned the laborer, or lowest pay grade, position, while 27% of the whites were assigned to laborer grade positions.

The statistics relating to the promotion rate of blacks in comparison to whites, while not overwhelming, also suggest that blacks have failed to be promoted out of the lower job grades (through grade 6) at the same rate as whites, despite equal seniority time accrued. Although job grades of 7 and above at B & D ordinarily must be construed as rankings which include differences other than purely numerical between any given grade, e. g., a job grade 8 may refer to a different *kind* of job than a job grade 9, the testimony of Mr. Cornelison at pages 69–71 of his deposition suggests that employees hired at grades 3 through 5, performing the *same* kind of job, may through adequate performance reviews move up in job grade to the grade 7 cut-off point. The Court therefore considers appropriate a comparison of job grades and the proportion of employees hired in the same year who have moved beyond, or stayed at or below, the job grade 6. Plaintiffs' exhibit 47, page 2, compiled by their expert statistician, and defendant's exhibit 59, compiled

by its expert statistician, indicate a uniform pattern dating up until 1971 of whites with the same hire years as blacks achieving, on the average, a higher job grade above 6 than blacks. Defendant's exhibit 47 shows that since 1970 and until the current year (1977), whites hired in each year on the average have a higher job grade within the grade 6 and below category than do blacks. While the Court is aware that unreasonable reliance cannot be placed upon "cold" numbers, the Court finds that they do indicate a factual pattern suggesting disparate treatment: that blacks hired in the same year as whites at B & D have not achieved the same job grades while doing the same job and have not been moving at the same rate through and out of the initial entry level ranks into the better employment levels beyond grade.[1]

Since 1965 B & D has had an apprenticeship program which currently offers opportunities for training as a tool and die maker, mold maker or machinist. Such training is of unquestioned value for an individual who seeks advancement and increased compensation at B & D in a high job grade level (10–12). Considerable numbers of current employees who work in tool and die, mold and machine shops at B & D and who were not hired from the outside with experience in the field are graduates of the B & D program. [Defendant's exhibit 39]. Of the 61 persons who have been accepted into the apprenticeship program in the years in which it has been given at B & D, only two have been black.

Among the more desirable positions to be attained as a B & D employee is in the professional job category of a "first-line supervisor", a management or "exempt" classification. Supervisors have considerable responsibility and play a vital role in the decisions made about intra and interdepartmental promotions and transfers. (See discussion below.) There are between 100 and 115 first line supervisors at B & D [Deposition of Cornelison at 26]; at this time, one

is a black (Jackson Scott, appointed in 1974 to Dept. 20). There are approximately 12–15 managers of departments at B & D, one of whom is black (Henry Cathern, appointed late 1975 or early 1976). Only one other black has been a supervisor (Major Cook, promoted to a supervisory position in 1974, switched to become a process specialist, grade 10, February 1975). As of the time of the filing of plaintiff Abron's complaint with the EEOC, no black had ever served as a supervisor at B & D.

It is clearly established as the law of this Circuit that when a plaintiff presents sufficient statistical evidence of discrimination he or she has made out a "prima facie" case under Title VII and the burden is upon the defendant to demonstrate the cause for the employment pattern is not based on discriminatory practice. No specific incidences of discrimination need be demonstrated and the individual plaintiff bringing the action on behalf of the class need not succeed in proving he or she has been a victim of discrimination. *Barnett v. W. T. Grant,* 518 F.2d 543 (4th Cir. 1975); *United States v. Chesapeake & Ohio Railway Co.,* 471 F.2d 582 (4th Cir. 1972); *Brown v. Gaston County Dyeing Machine Co.,* 457 F.2d 1377 (4th Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972). *See, generally, International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The "good faith" intent of the employer is irrelevant, since Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

A prima facie case of racial discrimination in hiring is made out when the plaintiff presents evidence that an employer has hired blacks in numbers disproportionate to the percentage of blacks in the

---

1. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

available labor pool. A plaintiff does not meet this burden by "mere citation" of the fact that blacks form a certain percent of the labor pool, *McAdory v. Scientific Research Instruments, Inc.*, 355 F.Supp. 468 (D.Md.1973), but rather must present substantial evidence, with breakdowns of figures of categories of job classifications, etc. In the instant case both plaintiffs and defendant have offered into evidence numerous statistical charts drawn from the United States Department of Commerce 1970 Census, as well as other documents and the testimony and calculations of their respective statistical experts. The plaintiffs argue that the Court should adopt the figures relating to the Baltimore, Maryland Standard Metropolitan Statistical Analysis (SMSA) and the defendant, that all reference to the Baltimore City figures in the Baltimore SMSA be discounted because of the location of the B & D plant in Hampstead, Carroll County, Maryland. The Court is not persuaded by the defendant's argument both because it is unrealistic and would seek to eliminate what is obviously a center of black population density from what has been and could be a reasonable commuting distance from B & D, and because the actions of the defendant itself indicate that it does not consider the immediate, 20-mile radius surrounding its plant, nor the whole of Carroll County to be its logical or desirable recruiting area.

The plaintiffs and defendant have agreed that the Hampstead plant is 29.2 miles from a major highway intersection in the central area of Baltimore City (St. Paul Street and the Jones Falls Expressway) and 25.1 miles from a major intersection in the central-western part of Baltimore City (North Avenue and Reisterstown Road). The uncontroverted evidence indicates that there is no direct mass transportation available from Baltimore City to the B & D plant which is in a rural area northwest of Baltimore City. Uncontroverted testimony of plaintiff Abron and several other black employees of B & D was that it took between 45 minutes and an hour to commute by car each way to and from B & D and their Baltimore City homes. Defendant's manager of personnel

services, Mr. Cornelison, testified that by his calculations 85% of the current B & D workforce resided within a 20 mile radius of the plant, a calculation which included employees living in southern Pennsylvania. Defendant's exhibit 30, a computer printout of April 1977 employees showing counties (and Baltimore City) of residence and race, indicates that 74 current employees reside in Baltimore City, 43 live in Harford County and 11 in Frederick County, counties which surround Carroll County. Plaintiffs' exhibit 30, consisting of the files of current black B & D employees supplied by the defendant during discovery, indicates 27 of 68 black employees reside in Baltimore City, or approximately 40%. The defendant introduced evidence in connection with the testimony of its expert indicating that the place of origin for 80% of those working in Carroll County was Carroll County and that the employed black population of Carroll County was small (742 persons; 2.71% black), as of 1970. [Defendant's exhibits 43(a) & (b), 44, 47] The defendant also introduced evidence from the 1970 U. S. Census indicating that approximately 48% of black families in the Baltimore metropolitan area owned automobiles, less than white families.

The defendant introduced a study by the Maryland Department of Transportation entitled "Vanpooling" [Defendant's exhibit 41], a project promoting the idea of vanpooling for employees of major regional employers, of which B & D was considered one, and its location noted on the Baltimore regional map. (Page 22 of exhibit). The regional map is a close representation of the Baltimore SMSA, *and B & D is considered a major "regional" employer.* The study announces as the "most noticeable benefit" the reduction in the amount of vehicular traffic, thereby indicating its premise that the employers listed have employees who reach work by automobile. At the outset, the study refers to at least one program in which vans were used to transport employees on trips as long as 120 miles roundtrip. (Page 9). The study further lists in its computation of over-the-road times for

automobile versus van one-way-trip, times that range from 25 to 60 minutes by car, one-way. There is no indication by the authors of the study that this would be an unusual or unacceptable amount of time to the commuter. Finally the study presents hypothetical plans for utilizing vanpools as means of transportation for six major Maryland employers and indicates the estimated home locations of their employees. In each study there is indication that employees live at considerable distances, are removed from major transportation lines and, in the cases of Bethlehem Steel (page 25), Hunt Valley Business Community (page 27), Social Security (page 35) and, particularly, Westinghouse (page 35) live at distances comparable to that of Baltimore City residents from B & D. Rather than supporting the defendant's argument that Baltimore City residents should not be considered among the labor pool for B & D, the vanpool study supports the plaintiffs' argument that the labor pool should include those within reasonable and actual commuting distance of B & D.

It is the finding of this Court that the Baltimore SMSA is the more instructive guide to the determination of a labor pool for purposes of the plaintiffs' burden in proving a prima facie case. The situation is analogous to that in *Taylor v. Safeway Stores, Incorporated*, 365 F.Supp. 468 (D.Colo.1973), *modified on other grounds*, 524 F.2d 263 (10th Cir. 1975), where the court rejected the suggestion that the referent population for purposes of statistical comparisons of labor force be only the city and county of Denver and elected to use the SMSA which contained five counties:

> Ours is a highly mobile society, and Safeway's distribution center is accessible by high-speed thoroughfares from the outlying suburban counties. Noticing the likelihood that persons employed by Safeway *may live* anywhere in the entire metropolitan area, we find the SMSA population is the appropriate one for purposes of statistical comparison in this case.

*Id.*, at 475. [Emphasis added.] The instant case is distinguishable from *Timken Co. v.*

*Vaughn*, 11 E.P.D. ¶ 10,906, 413 F.Supp. 1183 (N.D.Ohio 1976). In that case none of the employer's employees resided in the major city that was 25 miles distant from the plant, none of the applicants for employment resided in the major city and only four residents of the major city commuted to any of the other employers' facilities at which there were slightly under 3,000 persons employed. This Court is persuaded that the appropriate labor force is that which is encompassed in the area within which an employer can reasonably expect people to commute. *Cf. Legal Aid Society of Alameda County v. Brennan*, 381 F.Supp. 125 (N.D.Cal.1974). It is obvious that the defendant reasonably expects people to commute from Baltimore City because 74 current employees do so. Furthermore, as evidenced by plaintiffs' exhibit 6A—applications for employment received by the defendant in 1975—a considerable proportion of those applying for work in a given year currently reside in Baltimore City. (18 of 94 or 19%.)

Additional support for the use of the Baltimore SMSA including the Baltimore City statistics is derived from the actions of the defendant itself. Uncontroverted evidence from the defendant's records and witnesses shows that B & D has regularly used the services of employment agencies, particularly one named Fox-Morris, with headquarters in Baltimore City. [Plaintiffs' exhibit 33] Other agencies are used for the recruitment of exempt personnel (including supervisors) and these agencies are within Baltimore City. Some of the agencies have branch offices and B & D gets referrals from those locations, including out-of-state. [Deposition of Cornelison, page 88]. According to the testimony of Samuel Patterson, personnel manager at B & D from 1969–1973, "in the beginning" B & D had to recruit craftsmen from outside the employee population and "many" were from Baltimore City. He stated that the current policy is to "develop from within" and to "recruit only so far as people are willing to travel". Defendant's exhibit 39, a list of Outside Hires as craftsmen (and B & D apprenticeship graduates), indicates, how-

ever, that all six of the hires since 1970 gave been from outside the company and presumably these might have been made from Baltimore City, as they had been "in the beginning", since B & D had no reluctance then to recruit from the city population for the Hampstead plant. Perhaps the most telling evidence of B & D's interest in potential employees beyond the so-called 20 mile radius lies in its high school and vocational school recruitment pattern in the years 1971–1975. As part of the defendant's Admissions as well as its response to plaintiffs' interrogatories, the defendant indicated that in addition to recruiting at Greenmount, Westminster and Reisterstown, Maryland high schools located near the plant, B & D recruited high school or vocational school students in Sykesville, Catonsville, Towson, Parkville, and Bel Air, Maryland—locations which form a three-quarters circle around the city of Baltimore and at least two of which (Catonsville and Bel Air) are at further distances from the plant than is much of Baltimore City. The Court is persuaded that the defendant has intentionally omitted Baltimore City from its regular recruitment area, despite its awareness of the fact that it has had a low percentage of black employees [see comment of B & D on its 1963 EEO–1 form, plaintiffs' exhibit 1] and its awareness, expressed in the testimony of Samuel Patterson, that there exist vocational high schools in Baltimore City where there are students who are trained to do machine shop jobs.

Comparison of the Baltimore 1970 SMSA statistics for employed black persons and those of the hiring patterns of blacks by B & D as reported to the EEOC (listed in greater detail earlier in this opinion) reveals the following:

| OCCUPATION | 1970 SMSA | B & D 1970 | B & D 1971 | B & D 1972 | B & D 1973 | B & D 1974 | B & D 1975 |
|---|---|---|---|---|---|---|---|
| Officials/Managers | 6.4 | 0 | 0 | 0 | 0 | .5 | 1.0 |
| Office/Clerical | 16.3 | 1.3 | 1.3 | 1.5 | 1.4 | .7 | .7 |
| Craftsmen etc. | 13.8 | .6 | .6 | .8 | .8 | .8 | .8 |
| Operatives | 29.8 | 1.3 | 1.9 | 2.6 | 3.1 | 4.9 | 4.9 |
| Laborers | 45.9 | 6.5 | 8.4 | 7.5 | 5.7 | 11.2 | 13.0 |
| Service Workers | 40.0 | 28.6 | 25.8 | 24.5 | 24.1 | 22.8 | 16.7 |

Although the Court is aware that the Hampstead plant is not centrally located within the Baltimore SMSA and that it would be unreasonable to expect that the proportion of blacks hired could closely approach the SMSA statistics, there is, nonetheless, a clear picture of dramatic continued underhiring of blacks at B & D in all categories above that of laborer and particularly in the craftsmen and office/clerical categories. Plaintiffs have made a prima facie case of racial discrimination, thereby shifting the burden of proof to the defendant to explain what business necessity could account for the discrimination in hiring and assignment of black employees as well as other evidence of discrimination alleged by the plaintiffs.

## HIRING

The bulk of the arguments made by the defendant to account for the low percentage of blacks hired at B & D have been referred to in the preceding discussion of the statistics involved with the prima facie case. The defendant has failed to rebut the prima facie case of discrimination because there is a sizeable black population within reasonable commuting distance of the Hampstead plant and within the very territory which the defendant has shown through its prior and present hiring and recruiting practices to be the area from which it anticipates it will draw its employee population. Evidence produced by the defendant fails to explain its employment of blacks in proportion to whites at a rate of no more than $\frac{1}{7}$ the percentage of blacks in the experienced labor force in the Baltimore SMSA (21.99%).

Furthermore, the evidence produced in defendant's own exhibits indicates that B &

D continues to fail to hire blacks at the opening or entry job levels as of the present time. In exhibit 24 of the defendant, a computer print-out of jobs held by date of hire as of April 1977, the evidence shows that of current employees who have been *hired in 1977* at entry level job grade 3, 18 are white with no blacks, at entry level job grade 4, 15 are white with no blacks and at entry level job grade 5, 29 are white and 2 are black.

■ The recent Fourth Circuit case, *Roman v. E.S.B., Inc.*, 550 F.2d 1343 (4th Cir. 1976), upon which the defendant places heavy reliance, does not support a finding for the defendant. In *Roman* the employer had a non-white employee percentage *well above* the percentage of blacks in the relevant labor pool. *Id.* at 1352. Blacks were employed in 24 of 26 departments, there was a spread of blacks throughout the labor grades and in areas where there were few blacks, particularly in the supervisory and office/clerical areas, few were available in the labor force. The opposite is true here. Furthermore, in the important area of craft jobs, the employer in *Roman* employed eight times the amount of blacks supposedly "available" in the labor force. *Id.* at 1355. B & D in 1975 employed a number of black craftsmen representing *less than one-seventeenth* ($\frac{1}{17}$) available under the optimal SMSA conditions. The Court in *Roman* supported the finding of the trial court that a prima facie case had not been made under the *Brown* and *Barnett* standards. When such a case is made, as here, the burden continues to rest with the defendant to disprove the racial discrimination implied by the statistical patterns, which B & D has not done.

## RECRUITMENT

Closely connected to the question of hiring is that of recruitment of new employees for the B & D Hampstead plant. The evidence produced by the defendant to rebut the plaintiffs' prima facie case as it relates to recruitment is not only inadequate as a matter of law but also contradictory in fact and strongly suggestive of a discriminatory pattern both in effect and in intent.

In the deposition of Mr. Cornelison there appears the following exchange:

Q: So, you limit your recruitment efforts to a twenty mile radius, is that it?

A: I didn't say we limited it to the twenty mile radius. But basically, the labor market which we have agreed to is our labor market for recruiting purposes is approximately twenty miles from the plant.

Q: Then since Baltimore City is located twenty-five miles from Hampstead, Maryland, approximately according to the Department of Transportation, it falls outside of your labor market?

A: It falls outside of the concentration of people that we're drawing from.

[Cornelison deposition at 136]. In fact, B & D has actively recruited during the 1970's at senior high schools and a vocational high school which are further than the twenty-mile radius and further or equi-distant with the locations in Baltimore City which would be logical commuting points of departure for Baltimore City residents (the St. Paul's Street and North Avenue locations referred to earlier in this opinion). According to the 1976 official Highway Map of the Maryland Department of Transportation—the Court takes judicial notice of the map and it is made a Court exhibit in this case—, Catonsville is 28 miles from Hampstead; Towson is 27 miles from Hampstead; Parkville is 31 miles from Hampstead; and Bel Air is 33 miles from Hampstead, by indirect route along minor state roads. Sykesville, located at the border of Carroll and Howard counties and 20 miles from Hampstead, is also accessible to the B & D plant only via minor state roads. The defendant has seen fit to stretch its own self-imposed 20 mile recruiting radius to recruit high school students in each of these locations. Baltimore City, with its numerous vocational and senior high schools—and its sizeable black population—located at a distance comparable to any of the aforementioned cities, nevertheless falls "outside of the concentration of people" B & D is "drawing from". The

defendant suggests that its participation in a program aimed at encouraging minority junior high school students to remain in school, an admirable project known as "Project Go", is not a recruitment program. [Testimony of Samuel Patterson]. As part of the Project Go program, B & D has sent personnel to talk to students at numerous junior high schools, most of which have been in Baltimore City. [Plaintiffs' exhibit 22]. According to the testimony of Patterson, B & D has visited these schools to "accommodate" the Project Go administrators. Significantly, when it comes to talking with *senior* high school students who have remained in school and are concerned about jobs upon graduation, the defendant no longer has the motivation to make the trip to Baltimore City. Such policies suggest that the defendant's participation in the Project Go program is not evidence of the defendant's intent to pursue an affirmative action policy in recruitment.

█ The evidence makes clear the fact that B & D relies upon applications from those who know people already working at the plant. Plaintiffs' Exhibit 6A is a summary of all applications for employment between 1–1–75 and 12–31–75, which correlates with the applications produced by the defendant during discovery [plaintiffs' exhibit 6B]. The application contains a question about friends or relatives working at B & D. Of 94 applicants to B & D during 1975, 40 had one or more friends or relatives at the Hampstead plant. This reliance upon indirect recruitment serves to perpetuate the discriminatory effects of a workforce already heavily weighted toward whites, and thus itself becomes evidence of discrimination. *Barnett v. W. T. Grant, supra; Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970).

█ The only justification for standards and procedures which may, even inadvertently, eliminate or prejudice minority group employees is that such procedures arise from a non-discriminatory legitimate business necessity. *Griggs v. Duke Power Co., supra ; Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972). The defendant

has produced no evidence of legitimate business necessity for its patterns and practices of recruitment. *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971) *cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). The Court finds that the plaintiffs have sustained their claim of discrimination as to this aspect of employment at B & D.

### ASSIGNMENT AND CLASSIFICATION

█ The job and department to which a new employee is assigned at B & D is of considerable importance to that employee's future with the company. It is through the acquisition of skills and knowledge about the company's machinery and products that an employee may better his position and hope for promotions and increased compensation. This is abundantly illustrated both in the job descriptions defendant has given the 300-odd job classifications [Plaintiffs' exhibit 31] and in the scheme for promotion through the ranks that the defendant describes in Exhibit IX to its Second Supplemental Answers to Interrogatories. As previously discussed, blacks have been assigned disproportionately to the custodial jobs and to Departments 20 and 24, the packing departments. They have not been assigned to many departments of the company, indicating a *de facto* discrimination pattern for which the defendant bears the burden of explanation of any business justification. The defendant has failed to meet this burden. Almost all departments have entry level jobs for which minimal skills are required. The Baltimore SMSA statistics referred to earlier suggest that there are blacks available in the labor force to do many or all of these jobs. A particularly glaring example is in the office and clerical area where the Baltimore SMSA figure shows 16.3% blacks in the experienced labor force, but B & D has had virtually all-white labor population for all the documented years. A similar picture emerges for operative level jobs (job grade 5) in all but Departments 20 and 24.

From the description of the hiring and assignment procedure given by the defend-

ant's witnesses and by plaintiff Abron in her testimony, it is clear that the personnel office makes the determination where new employees will be placed and that usually applicants do not have a specific department they wish to work in, much less a specific job (although the latter may occur). It is thus the personnel administrators who have the knowledge of where entry level openings exist and who make the decision on filling them. No persuasive argument has been produced by the defendant to account for the pattern of assignment of black employees. When Samuel Patterson was asked for his understanding of the reasons why 67.4% of the custodians in 1965 were black, he suggested that fewer whites who came in had "indicated a particular interest in that job".

One of the leading Fourth Circuit cases in the Title VII field, *Brown v. Gaston County Dyeing Machine Company, supra,* focused on the evidence of discrimination in the assignment of black employees. In that case blacks had been hired in disproportionate numbers into job classifications rated at the bottom of the company's pay scale and which afforded little opportunity for advancement to higher paid positions. The same is true at B & D. Further, the Court in *Brown* emphasized the lack of "fixed or reasonably objective standards and procedures" for hiring into specific job positions, *i. e.,* assignment on the part of the employer. B & D has offered no objective criteria for the manner in which the successful applicant is assigned his job. There is supposedly an interview with applicants, but there is no evidence of its content, no formal interview form and no indication from the defendant whether the applicant is told of more than one department in which there may be an opening. There is even some question whether such interviews take place; Abron testified she was not interviewed before receiving her assignment to Department 20.

The defendant has failed to rebut the plaintiffs' prima facie case of discrimination in job assignment inasmuch as the statistical evidence gives clear support to the conclusion that racial discrimination in assignment has existed and continues to exist at the Hampstead plant. *See, Brown v. Colman-Cocker Company,* 10 E.P.D. # 10,492 (W.D.N.C.1975); *Johnson v. Ryder Truck Lines, Inc.,* 10 E.P.D. # 10,535 (W.D.N.C. 1975); *Young v. Edgcomb Steel Co.,* 363 F.Supp. 961 (M.D.N.C.1973); *aff'd in part, rev'd in part* (on other grounds), 499 F.2d 97 (4th Cir. 1974). The use of invalidated tests such as the Wonderlich and Thruston to decide assignments until 1970 is further evidence of discrimination since there may be among the class blacks hired before 1969 who received unfavorable assignments on the basis of these test results. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

## PROMOTION AND TRANSFER (PERMANENT)

Promotions and transfers are made on the basis of an employee's work record, demonstrated ability and company seniority, according to the testimony of the manager of personnel services. Since 1971, when the management introduced a new employee evaluation form, the supervisors have conducted semi-annual reviews of the employee's performance and have rated the employee according to the various levels of performance, attitude and attendance that appear on the form. [Defendant's exhibit 13]. These ratings are reviewed with the employee by the supervisor and the employee is permitted to make written comments on the form about the ratings he or she has received. Then the supervisor makes an over-all evaluation rating of the employee as outstanding, good, satisfactory, minimum or unsatisfactory. There is a space on the form for the employee to express his or her "views" about his present assignment and working conditions, and about future interests or "objectives" at B & D. These topics are to be discussed by the employee and the supervisor. The evaluation form is signed by the employee after it has been read and completed. The adoption of this form of review was instituted after a survey of employee attitudes found the areas of greatest negative feeling were those con-

cerning management policies, the lack of "opportunity" and favoritism. Until the time of the adoption of the new evaluation process, B & D had a point system. If an employee failed to reach a total number of points for various job grade levels, there was no pay increase, which for those joining at entry levels of job grade 3 and 5 is the first form of "promotion" (although the job done remains the same). With the current evaluation system, an employee receiving a "satisfactory" would receive an increase in *pay* if there was still room within the pay range for his grade level. [The salary ranges within job grade appear on defendant's exhibit 12.]

Under the transfer policy described by Messrs. Patterson and Cornelison and as outlined in the personnel manual, the employee must put in a written request for transfer with the personnel office, where it remains on file for one year after which the employee is notified that he must submit a new one if he so desires. [Defendant's exhibits 14A & B]. On the transfer form the employee must indicate what related experience he has for the job or department to which he seeks a transfer. The defendant does not make available to its employees any written descriptions of the job qualifications for the 300-odd job classifications at the plant, not does it have any system of posting notices of job openings. [Testimony of Cornelison.] Coupled with the fact that supervisors know nothing of job availability in other departments, this means that employees must "apply" for transfer to jobs about which they know little or nothing and do not know whether the jobs are, or will become, available. Employees must "apply" for job openings in their own departments informally and indirectly by whatever approaches they can make to a supervisor. They do not know if and when openings exist and only the supervisors, the individual planning to vacate the job and whomever he tells, are aware of such promotion opportunities. The testimony of all the black employees who appeared at trial, including Abron, was that none had ever been "counselled" about job opportunities, much less promotional opportunities within their own departments. Elise Dorsey, a desk clerk in Department 3, testified that she only knows of transfers and promotions by word-of-mouth and by seeing new faces. She stated that her position permitted her to learn more about employee shifts than most individuals, and more than any of the black employees, but that jobs she inquired about were always filled by the time she learned of them.

The explanation for the failure to post job opening notices is that such a technique would make B & D too much like a "union shop", would be "too regimented" rather than "open and communicative" and would lead to "disappointed" employees who were unsuccessful in bidding for a job opening. [Testimony of Samuel Patterson.] Mr. Cornelison stated that the transfer system was used instead, "as a tool to insure the employee is not acting on impulse" and "to give the employees facts in which to make a sound decision regarding a job change". [Cornelison deposition at 64–65.] In fact, however, employees do not have that information because it is not provided or at least only selectively. The defendant most often promotes from within the department in a "natural progression" based on the experience accrued by employees. [Testimony of Patterson.] Therefore, although a department supervisor and manager must put in a formal requisition to fill an opening within their department, there is no record on file with the personnel department of employees *in* that department who are interested in promotion *within the department*. When the personnel managers and the departmental supervisor and manager discuss filling the opening, a supervisor can make a recommendation "as to whom he or she feels would be or should be considered for the job". [Cornelison deposition page 66.] The manager decides who should get the promotion "based on the employee's work performance and . . . demonstrated ability" [Cornelison deposition page 67], but that in turn has been measured and documented by supervisors *without plant-wide standards*. As noted earlier, as of the filing of this suit, no black person was or had ever

been a supervisor, or a department manager.

Viewed in combination with the statistical evidence concerning the percentage of black employees holding the lowest ranking job grades and classifications, the system employed by the defendant clearly acts to perpetuate racial discrimination. The defendant in this case argues the merits of a system which the Fourth Circuit has affirmatively rejected. As the Court stated in *Brown v. Gaston County Dyeing Machine Company, supra,* 1380, 1382–3:

> The company advertised that it is an "equal opportunity employer," but it has no objective, formal guidelines for hiring, promotion, and transfer, or for giving notice of vacancies within the plant except by word of mouth . . . . .
>
> Employment and promotion policies that operate without objective standards for the direction of supervisory personnel may appear impartial, but recently we cautioned: "Practices, policies or patterns, even though neutral on their face, may operate to segregate and classify on the basis of race at least as effectively as overt racial discrimination. Particularly is this so if a history of past discrimination is developed." *United States v. Dillon Supply Co.,* 429 F.2d 800, 804 (4th Cir. 1970) . . . . . Moreover, the record disclosed that notices of vacancies are not posted, and news of them is passed along by word of mouth. When job classifications are as segregated as they are in this company, delay in learning about a vacancy in an all white category may *in itself discriminate* against a black employee who hears of it only after it has been filled. . . .
>
> In sum, the lack of objective guidelines for hiring and promotion and the failure to post notices of job vacancies are badges of discrimination that serve to corroborate, not to rebut, the racial bias pictured by the statistical pattern of the company's work force.

[Emphasis added.] *See also, Young v. Edgcomb Steel Co., supra; Barnett v. W. T. Grant Co., supra; Stewart v. General Mo-* *tors Corp.,* 11 E.P.D. # 10,736 (N.D.Ill. 1975). As stated by the Fifth Circuit in *Rowe v. General Motors Corp., supra,* at 359:

> promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. We and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action.

The Court does not suggest that white supervisors are unquestionably biased in their recommendations and ratings of blacks for promotions. It is sufficient to note that supervisors' recommendations are a "vital part of procedure that has had inequitable" results, since the statistics reviewed earlier show that black employees with the longest seniority time accrued have failed to be promoted into the labor grade 7 and above (craftsmen) positions in the same proportion as whites. *Stewart v. General Motors Corp., supra.*

The defendant has offered no evidence of the existence of any objective criteria for the selection of supervisors. Samuel Patterson, former personnel director at the Hampstead plant, testified that one way that supervisors were hired "sometimes" was to solicit from the outside. No standards for these solicitations has been provided. During the time Patterson served as personnel manager at Hampstead, no blacks were selected either from within or without the company to be supervisors. Patterson admitted that results of a Wonderlich test given new employees until 1970 and acknowledged to be invalidated for job relatedness were used by management "for our guidance" in selecting supervisors. The use of such invalidated tests is in clear violation of Title VII, 42 U.S.C. § 2000e–2(h) as interpreted by the Supreme Court in *Griggs, supra,* and recently in *Albemarle Paper Co. v. Moody, supra.* While Patter-

son claimed that the results of such tests had been removed from employees' files and testing had been discontinued after 1969, his tenure as personnel manager at Hampstead was from 1969–1973 and it was his testimony that the test results had been used for guidance in selecting supervisors. Since there was no specific evidence as to when the test results were "removed" from employee folders and what happened to those results, the Court must conclude that there has been continued utilization of these invalidated tests in making the important choice of employees to become supervisors. These findings strengthen the statistical challenge by plaintiffs that there has been discrimination in the selection and promotion of employees to supervisory posts and lead to the conclusion that the plaintiffs have proved discrimination in this aspect of the promotional policies of the defendant. *Barnett v. W. T. Grant, supra*, at 549–550.

## TEMPORARY TRANSFER

In her individual claim the plaintiff, Sarah Abron, alleges that because she is black she was denied a temporary transfer to light duty-work for reasons of health, whereas other white employees are granted such transfers.

In order to obtain a temporary transfer for medical reasons a B & D employee does not go through the formal submission of a written transfer request with the personnel office but makes an informal request of his or her supervisor "who, if he is not in a position to fulfill the request, refers that person to the Safety and Health Department". [Plaintiff's exhibit 41].

Sarah Abron was employed in July 1970 and was assigned to Department 20 as a "production assembly trainee," job grade 3, and was subsequently reclassified (along with the other production assembly trainees) as a Product Assembler C, also job grade 3. [Defendant's exhibit 34]. She received a 10¢ wage differential increase when she began working the night shift and she received two 10¢ merit increases in 1971 following her semi-annual and annual

reviews. (She also received an increase as a result of a general (plant-wide) pay increase in February 1971.) In the fall of 1971 Abron became pregnant and later suffered a miscarriage. She was on medical leave until February 1972 when she returned to work with a letter from her doctor that she should be assigned light duty work. She testified at trial that she was not assigned "light duty" work but remained assigned to the assembly line where she worked standing up. She stated that she spoke with her immediate supervisor and her department manager but was told that the job she was doing was the only job they had for her, that she could not be shown "favoritism" and that if she could not do the job she should go home. She remained at work and did the job but was not referred to the Safety and Health Department.

Abron went on medical leave again on March 18, 1972 for a previously scheduled operation (hysterectomy) and was out of work until July 1972. She stated that she was not recovered by then but that her physician had received a phone call from either the personnel office or the insurance company which was paying her disability during sick leave, inquiring why it was taking "so long" for her to get well. She testified that her doctor gave her a letter requesting light duty work so that she would not lose her job.

Abron presented the letter from her physician to her supervisor upon returning to work in July 1972. [Plaintiff's exhibit 37]. She testified that she was not given light duty work but was assigned a job packing grass shears, making up the boxes into which they were to be placed and pushing the packed boxes onto a conveyor belt. This job was done standing, and involved stretching and bending. Packing approximately 900–1000 shears per shift, she spoke with Dennis Price, the supervisor, and told him the work was not light enough, and stated he replied there was no other work available at that time. She subsequently told him she would have to give two weeks notice because the job was too strenuous and that he replied that if it was hurting

her health she could quit immediately, which she did. Again, she was not referred to the Safety and Health Department.

Dennis Price, an assistant manager in supervisory capacity assigned to the Department 20 night shift in 1972, testified that when Abron returned in July 1972 she requested seated subassembly work but that he had been taking people out of that area because of diminished plant requirements and told her there was no position in subassembly. He assigned her first to wiping 3 lb. drills (standing), and the next evening, upon her request that she be given another *lighter* job, to packing grass shears. The following night, he "asked" her if she would take on the additional task of wrapping chargers and cords and placing them in small boxes which were to be added to the cartons of shears. Price's testimony was that Abron said she would "try" and never told him that forming the carton or wrapping the chargers was "too much" work. He stated that she subsequently told him that her doctor had said "working was hazardous to her health" and that she wished to give two weeks notice. He reported he told her she could quit immediately for health reasons. She allegedly said she wished to talk with her husband about it, returned the next night and said she had decided to quit as of Friday of that week. Price testified that Abron had been a satisfactory employee, that she had never told him that she felt she was unfairly treated because of her race and that the subject of race discrimination was never raised at the two hearings he attended concerning her application for unemployment compensation.

On cross-examination Price acknowledged that he had received a phone call from Abron approximately one week before she returned to work in July 1972, informing him that she specifically wished to be given subassembly work and that he had replied that he would "check" about it, but did not confirm she would receive such work. He further admitted that shifting of personnel in and out of the subassembly area did occur and he "supposed" that someone could have been replaced by Abron on a temporary basis. He admitted that he did not advise Abron that she could have received pay rather than quitting her job claiming that he did not refer her to the Safety and Health Department because she "didn't have that kind of problem". He also acknowledged that when he testified as a voluntary witness before the unemployment board (to whom B & D was protesting the award of benefits to Abron) he did not mention Abron's doctor or the "health reasons" as comments made to him at the time Ms. Abron resigned.

From the testimony at trial it appears that Abron called her employer to inquire why her application for unemployment benefits was being protested and she spoke with Samuel Patterson. She claims that he told her they "might" find something for her if she came back to work and that after discussing this with her husband she decided that after the way she had been treated she did not want to return. Patterson's testimony was that he told her that if she was "ready and willing" she would be welcome back at work, and that she should be ready to assume regular duties because the two-month period covered by the doctor's letter had almost passed. This testimony of Patterson, although inherently credible and perhaps indicative of a misunderstanding in communication between himself and Abron, does not jibe with the termination report filed on her by Dennis Price, who did not recommend her rehire because of her absentee record. [Plaintiff's exhibit 42]. The defendant produced no evidence and Price did not offer in his testimony that any inquiry was made of him about the further availability of work for Abron that would be lighter than that which he had assigned in July or which would be in the subassembly area.

In support of her claim, Abron produced as witnesses three white employees of B & D who affirmed the validity of their prior written statements about offers to them of light duty, *seated* jobs when they had doctors' letters for light duty work. [Plaintiff's exhibits 27A, B & C]. In two cases the offers had been made, unsolicited, by

the supervisors; in one case, the employee had successfully requested a seated job. The defendant offered no evidence to refute these occurrences, one of which took place in August 1972, [Plaintiff's exhibits 27C and 34E] and involved making very light duty work available in Department 24 which is assembly/packing work similar to the general kind of work done in Department 20. The only example of the offer of similar light duty work to a black employee was the information solicited by defendant's counsel on cross-examination of plaintiff's witness Shirley May Cannon that she had been granted her request for subassembly work, immediately prior to taking maternity leave in January 1977. She was transferred from Department 20 to Department 24 and stated that her supervisor did not have to go to the personnel office to make the arrangements. The Court notes that this transfer was effected after the filing of this law suit and shortly before the trial. The same witness had testified that she was aware that Abron (with whom she commuted) had asked for and been refused what Abron considered "light duty" work and that it was the witness's impression from her experience that white employees who request light duty work "seem to get it".

The defendant argues that Abron was not denied light duty work and that her voluntary termination of employment in July 1972 was for her own purposes, unrelated to her race. To support that argument the defendant has highlighted the fact that she did not speak of racial discrimination in her conversations with her employers, or with the unemployment boards and did not show positive interest in returning to work when the suggestion was made by Samuel Patterson in August 1972. The defendant also argues that Abron did not seek new employment until June 1973 after the time her unemployment benefits had been exhausted. Abron testified at trial that she was "looking all the time" for employment from November 1972 on, went to the unemployment bureau for counselling on job opportunities, but was never sent for a job which she was eligible and on her own succeeded in obtaining a job at General Motors in 1973, from which she was later laid off. She has been working since January 1974.

■ The evidence indicates that Abron's supervisor failed to honor her request for light duty work in February and July 1972 for which she had made clear and reasonable demands and failed to make any attempts to find light duty work in other departments. The personnel office made no attempts to make accommodations (either by transfer or indemnification) for Abron when they were made aware that health reasons prevented her from continuing to perform the only jobs which her supervisor, who controlled the assignment of jobs within her department and shift, had offered her. Such accommodations had been made for white workers, by supervisors of their own volition or upon request, when the white workers had physical conditions similar to Abron's. The Court accepts her explanation that she was discouraged by her treatment by her superiors and did not believe that any further efforts would be made for her based upon her prior experience and that this was the motivating factor in her refusal of the offer of employment in August 1972, a time within the guidelines her physician had given her for performing only light duty work. The failure of an employee to accept re-employment from an employer whom the employee feels mistreated him on racial grounds does not deprive that individual from asserting his rights under Title VII. There is no requirement of a return to abusive conditions. The responsibility of an employee who has left work because of discriminatory conditions is to make diligent efforts to seek other employment where discriminatory conditions do not exist. *Brown v. Colman-Cocker Co., supra.* Cf., *O'Neal v. Gresham*, 519 F.2d 803 (4th Cir. 1975). Title VII of the Civil Rights Act of 1964, as amended, § 706(g), 42 U.S.C. § 2000e–5(g), provides that "Interim earnings or amounts earnable with reasonable diligence by the person discriminated against shall operate to reduce the back pay otherwise allowable". The

burden is upon the defendant to show such amounts or the availability of other employment which the employee did not act reasonably to procure. *Inda v. United Air Lines, Inc.*, 405 F.Supp. 426 (N.D.Cal.1975). The only earnings referred to in the evidence were those of Abron from her short term of employment at General Motors in 1973 and those which she has received since her employment in 1974. The testimony of the plaintiff at trial was that she had been looking for work from November 1972 through the time she successfully obtained employment at General Motors and after she was laid off there, until she obtained her present job. She claimed, and the defendant offered no evidence to dispute, that she went regularly to the unemployment compensation bureau for counselling on jobs during the time she was receiving benefits and thereafter made applications for employment and inquiries on her own. The defendant has failed to sustain its burden of showing there were available substantially similar jobs to that which Abron, was performing at B & D which she could have discovered and for which she was qualified. The monies which she received as state unemployment compensation "are made to carry out an independent social policy" and are not deductible from a backpay award under Title VII. *Inda v. United Air Lines, Inc., supra; Tidwell v. American Oil Co.*, 332 F.Supp. 424 (D.Utah 1971).

Plaintiff is entitled to receive back pay (and the money equivalent of attendant fringe benefits and vacation pay) for the period in July through September 1972 which represented the balance of days of the two month light duty time recommended by her physician plus back pay and fringe benefits for the period from November 1972 until January 1974, less her earnings from General Motors.

## COMPENSATION, TERMS, CONDITIONS AND PRIVILEGES

■ There is no evidence of discrimination, in an isolated sense, in the treatment of black employees at B & D in the areas of compensation, and terms, conditions and privileges of employment. The discrimination found in the areas of assignment and classification and in promotion and transfers may manifest itself in lower compensation of employees but this factor is to be remedied by the provisions for back-pay awards made in this case, an appropriate method for affirming the "make whole" purpose of Title VII. *Albemarle Paper Co. v. Moody, supra.*

## THE APPRENTICESHIP PROGRAM

■ As indicated in the discussion of plaintiffs' prima facie case, B & D has conducted an apprenticeship program to train individuals for the jobs of tool and die maker, mold maker and (recently) machinist on an annual basis since 1965. Sixty-one persons have been admitted to the program [Plaintiffs' exhibit 19] of whom only two have been black. One of these was accepted *after* the filing of Abron's EEOC charge. The B & D apprenticeship program is a major stepping stone into the higher job grades associated with the craft field, where there are few blacks employed even in 1977, and to grades 10–12 where, as of April 1977, there were no blacks. According to the testimony of Samuel Patterson, it is in the craft grades particularly that B & D attempts to develop from within, and progression upward in responsibility and salary depends on the years an employee has spent "developing under training with a superior". B & D's descriptions of the apprenticeship program make it clear that it is the prior evaluation of an individual's work record and the impressions of the training panel in screening the application that are the first steps in applying for the apprenticeship program. The screening panel consists of two tool room managers and the training and employee activities manager, all of whom are white. The "prior evaluations" are those held by this Court to be void of objective standards or written guidelines for supervisors. The second step is an initial screening interview by the same personnel plus the supervisor of the tool and die maker and mold maker apprentices. [Cornelison deposition 92–105]. Nowhere in

the written standards of Apprenticeship [Plaintiffs' exhibits 25 & 38] are there any indications of standards for these interviews, or records to be kept during the interviews. This in itself is in violation of the affirmative action regulations governing employers who hold federal contracts, Section 30.5(b)(4)(b) of which reads:

> Where interviews are used, adequate records shall be kept including a brief summary of each interview and the conclusions on each of the specific factors, e. g. motivation, ambition and willingness to accept direction which are part of the total judgment.

After the screening interview, there is "input" from the department manager and supervisor of the employee concerning his performance. Once again, no standards or guidelines appear to govern. *If* the employee is considered an appropriate applicant, he or she is sent to take the GATBI test, administered by the Maryland State Department of Employment Security and graded by the agency at high, medium or low. The test measures mechanical aptitude, mathematical and verbal skill. [Testimony of Samuel Patterson.] It has not been validated for job relatedness under the *Griggs* and *Albemarle* standards, and no example of the test has been provided by the defendant.

Following receipt of the GATBI scores a final screening of applicants occurs. In the defendant's February 1976 response to the plaintiffs' interrogatories, an apprenticeship program outline which is plaintiffs' exhibit 25 was furnished to plaintiffs' counsel. Appendix A is a description of the apprentice selection procedure indicating that as of 1976 a point system was used to determine the "best" applicants. The highest single factor (30 points) was the evaluation from an employee's present supervisor. An "above average" score on the GATBI gave 15 points to an applicant, "average" 5 points and "below average" meant "the applicant is rejected". The selection procedure also indicates that a preliminary deci-

sion on an application was made before the applicant was seen in an interview. (Point D of procedure). If the individual remained in consideration after this first cut, he or she was seen by the Training Committee in oral interview for which he or she was given points for "attitude", "interest in apprentice programs", "appearance" and "personality". There is no indication in the record by what means or according to what standards the committee judged attitude, appearance and personality. The opportunity for use of totally subjective criteria is blatant; the result of this unstructured apprenticeship system has been the exclusion of blacks on all but two occasions.

At some point in 1976 or 1977, B & D changed its apprenticeship program to the program described in plaintiffs' exhibit 38; a major change is the absence in the new Appendix A discussing the selection procedure, of any discussion of points, although the factors on which the applicants are rated remain the same. No explanation has been presented for the change in the apprenticeship program and there has been no indication that any objective written standards have been adopted for the selection procedure. If there has been a change in the weight given the various factors in selection, the record does not reveal it. The method of selecting individuals for apprenticeship has yielded racially discriminatory results and must be revamped to affirmatively further the opportunities for blacks who *can qualify* for an objective, job-related entrance standard.

## RELIEF

In accordance with the foregoing findings of fact and conclusions of law made pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court, in exercise of its powers under § 706(g) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5(g), directs that the following forms of relief shall be granted the individual plaintiff and the class she represents: [2]

**2.** The Court is not unmindful of the unique position B & D occupies in the Greater Balti-

more community. It has frequently lead the way of enlightened businessmen in civic and

1. Declaratory judgment is hereby entered for the plaintiffs finding that the defendant, the Black and Decker Manufacturing Company, violated the civil rights of the individual plaintiff and the class as protected by 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 in the areas of hiring, recruitment, assignment and classification of jobs, promotions and transfers, and in the apprenticeship program. The defendant, its agents and managers are hereby permanently enjoined from continuing to discriminate against current and future black employees at the Black and Decker Hampstead plant and black applicants for employment at that plant.

2. In order that the discriminatory condition in employment found to exist be swiftly and effectively corrected, the defendant is ordered to take the following actions:

a) to develop a program of affirmative action to increase the number and percentage of qualified blacks working at the Hampstead plant in all departments and in all classifications where they are currently shown to be underemployed. To guide the defendant in the establishment and implementation of its efforts, the Court finds that an appropriate general goal for Black and Decker is to achieve a percentage of black employment in the basic EEO categories equal to one half the figures for experienced black employment in the Baltimore SMSA reported in the 1970 Census.

b) to develop a system of regular, active and intensive recruiting at high schools, secretarial and vocational schools within Baltimore City with the purpose of attracting qualified black applicants to work at the Hampstead plant, particularly in the crafts, mechanical, and clerical areas.

c) to consult with employment agencies specializing in minority hiring for the purpose of attracting skilled black labor from the outside to fill current and future available positions in the job grade 7 and above,

in the clerical and office positions and in the supervisory areas in those instances in which there are no black employees at the B & D Hampstead plant sufficiently skilled to fill positions immediately available and in which a current black employee could not effectively be "trained on the job".

d) to provide to applicants for employment at the Hampstead plant a list of all job openings for which applicants may wish to be considered.

e) to provide the Hampstead employee population, in such manner and in sufficient quantities to be readily usable, full and complete job descriptions of all positions at the plant, exempt and non-exempt and a description of management's conception of job and skill progressions (similar to those provided plaintiffs during discovery), and to provide sufficient personnel staff to explain these materials to interested employees.

f) to provide detailed postings of *all* job openings with requirements, duties and description of what skills developed in other job areas or departments might suffice to prepare an employee to assume the position. Postings should be made for a reasonable period of time in advance of a departmental and personnel decision about filling the position.

g) to develop and define in detail and in writing, and make available to the employee population, as well as appropriate supervisors, objective criteria which will govern:

i. semi-annual and annual evaluations. Criteria to be plant-wide and uniform.

ii. interdepartmental and intra-departmental promotions and transfers.

iii. selection of supervisors.

iv. selection of apprentices for apprenticeship program.

3. In order to establish the proper measure of equitable relief in the form of back pay for individual members of the class and in keeping with the pre-trial agreement of the parties and the Order of this Court, a

---

community activities. Nor is the Court unaware of the philosophy of the founders 67 years ago when they stated "We do not believe in discrimination and we decline to give to one

what we would not give to all." Regrettably, this philosophy has not filtered down through all management levels.

Special Master will be appointed under Rule 53 F.R.Civ.P. Such an award is in keeping with the plan and spirit of Title VII as it has been interpreted by the Supreme Court. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Albemarle Paper Co. v. Moody, supra.* It shall not be a requirement that an opportunity for assignment, promotion or transfer currently exist at the Hampstead plant, but only that the individual is qualified for same and has not received it. *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1976), *cert. denied*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976). Counsel shall suggest to the Court some "convenient method of taking all the effects of past discrimination into account" for computation of awards in those cases, if any, in which the Special Master finds an assignment was requested or a transfer applied for and denied and the defendant is unable to sustain its burden of proving that discrimination was not the cause. The situations involving promotion within a department are more difficult because there has been no provision in the defendant's procedures for an employee to make formal application for promotion. Because of this procedural fault of the defendant, black employees will not be prevented from presenting to the Special Master the evidence they may have of their having deserved promotion based upon skill and seniority. *Cf., Equal Employment Opportunity Commission v. Enterprise Association of Steamfitters Local 638*, 542 F.2d 579, 588 (2d Cir. 1976) (appeal pending); *International Brotherhood of Teamsters v. United States, supra*, parts III A & B.

4. As detailed in the earlier section of this opinion, the individual plaintiff, Sarah Abron, shall be compensated with an award of back pay and benefits for the period in July–September 1972 during which she should have been assigned true light duty work, and for the period of November 1972 to January 1974, minus earnings from other employment.

5. It is the finding of the Court that the plaintiff's counsel, Norris and Karon Ramsey, have faithfully, arduously and effec-tively served their client in bringing this suit, pursuing discovery, presenting appropriate motions to the Court and litigating the matter in trial. Their efforts have on numerous occasions been made in the face of inexcusable and unprofessional delay and other circumstances directly attributable to the defendant's agents and counsel. The Court finds that the plaintiff's counsel are entitled to an award of reasonable counsel fees pursuant to statutory provisions under Title VII, 42 U.S.C. § 2000e–5(k), and to any costs incurred in the bringing of the motions for Rule 37 Orders from this Court and for the striking of the defendant's response to Requests for Admission. Counsel will present certified evidence of billable hours and costs and an appropriate award will be made by the Court upon review with all counsel.

Counsel will promptly meet to agree upon an order to implement the findings herein.

SO ORDERED.